Christina D. PERRY–BEY, Plaintiff,

v.

**CITY OF NORFOLK, VIRGINIA,**
**Defendant.**

**Civil Action No. 2:08cv100.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 15, 2009.

350

Christina D. Perry–Bey, pro se.

Paul W. Jacobs, II, Melvin W. Ringer, for Defendant.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is before the Court on Defendant's "Motion of City of Norfolk to Dismiss Complaint Under Fed.R.Civ.P. Rules 12(b)(5) and 12(b)(6)," and Plaintiff's "Motion to Reconsider Plaintiff's Motion for Civil Contempt of Court and Issue Show Cause Order as a Matter of Law."

The parties, and *amicus curiae* Norfolk Branch of the National Association for the Advancement of Colored People ("NAACP"), appeared before the Court on September 17, 2008 for oral argument. The motions are now ripe for decision, and the Court considers the merits below.

## I. Factual and Procedural History [1]

### A. The *Collins* Litigation

*Collins v. City of Norfolk,* Civil Action No. 83–526–N, is the precursor to this litigation. A proper understanding of the motions before this Court requires a review of that case. That suit was filed here in 1983 by seven African–American citizens of Norfolk, Virginia, and the Norfolk Branch of the NAACP, alleging that the "at-large system of electing members of the Norfolk City Council unlawfully dilute[d] black voting strength in violation of Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973." [2] *Collins v. Norfolk,* 605 F.Supp. 377, 379 (E.D.Va.1984) (*Collins I*). The *Collins* plaintiffs also alleged that "the at-large system was adopted in 1918 and ha[d] been maintained for a racially discriminatory purpose in violation of their Fourteenth and Fifteenth Amendment rights and 42 U.S.C. § 1983." *Id.*

After a trial before United States District Judge J. Calvitt Clarke, Jr., the District Court determined that there had been no violations of the Voting Rights Act, the Fourteenth Amendment to the United States Constitution, the Fifteenth Amendment to the United States Constitution, or 42 U.S.C § 1983. *Id.* at 406–07. The plaintiffs appealed the District Court decision denying their Voting Rights Act claim, but did not appeal the District Court decision on the two constitutional claims and the 42 U.S.C. § 1983 claim. The United States Court of Appeals for the Fourth Circuit affirmed that decision. *Collins v. City of Norfolk,* 768 F.2d 572 (4th Cir.1985) (*Collins II*). The United States Supreme Court then vacated the judgment of the Fourth Circuit and remanded the case for further consideration in light of its ruling the previous week in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Collins v. City of Norfolk,* 478 U.S. 1016, 106 S.Ct. 3326, 92 L.Ed.2d 733 (1986) (*Collins III*). The Fourth Circuit then reversed the District Court's judgment and remanded for further proceedings consistent with the *Gingles* decision, including reconsideration of the issues of racial polarization, minority electoral success, candidate slating, and government responsiveness in the East Ghent redevelopment. *Collins v. City of Norfolk,* 816 F.2d 932 (4th Cir.1987) (*Collins IV*).

Because the *Collins* plaintiffs had not appealed the District Court's ruling on their Fourteenth and Fifteenth Amendment claims, nor their claims under 42 U.S.C. § 1983, those rulings were not before the District Court on remand. However, the District Court did consider the designated issues in the context of the plaintiffs' Section 2 Voting Rights Act claim. On remand, the plaintiffs sought: a declaratory judgment that the at-large system of electing Norfolk's City Council members unlawfully diluted African–American voting strength; an injunction prohibiting the holding of future City Council elections under the at-large system; and the replacement of the at-large

---

1. The facts recited here are facts assumed for the purpose of deciding the instant motion to dismiss and motion for reconsideration and are not factual findings for any other purpose.

Statements regarding court opinions and orders are matters of public record.

2. Under the "at-large" system, the entire city voted on each member of City Council.

system with a system of wards or single-member districts. *Collins v. City of Norfolk*, 679 F.Supp. 557 (E.D.Va.1988) (*Collins V*). The parties then agreed that the record from the prior trial was sufficient for the District Court to decide such issues, and therefore no additional evidence was submitted. Plaintiffs submitted a memorandum of law asking that the District Court "hold that at-large city council elections in Norfolk violated Section 2" of the Voting Rights Act. (Mem. For Pl.'s on Remand 49, filed Sept. 21, 1987, *Collins V*.) After further consideration, and applying the new *Gingles* standard, the District Court again found that Norfolk's at-large system for the election of City Council members did not violate Section 2 of the Voting Rights Act. *Collins V*, 679 F.Supp. at 587.

Plaintiffs again appealed the District Court's decision to the Fourth Circuit. The Fourth Circuit reversed the District Court and directed that:

[u]pon remand, the district court should enjoin at-large elections for city council. The district court should afford the city a reasonable, specified time to prepare a plan that will remedy the vote dilution arising out of the city's at-large electoral system. The city must then submit the plan for clearance under section 5 of the Voting Rights Act of 1965. 42 U.S.C. § 1973c. If the city fails to enact a legal plan, the court should prepare a single district plan for the conduct of future elections.

*Collins v. City of Norfolk*, 883 F.2d 1232, 1244 (4th Cir.1989) (*Collins VI*). The City of Norfolk then sought review by the Supreme Court, but the Supreme Court denied the Petition for Certiorari. *City of Norfolk v. Collins*, 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990) (*Collins VII*).

Once the matter was returned to the District Court, the parties submitted an agreed order signed by both counsel that was entered by the District Court on January 3, 1991. That order provided as follows:

This day came the parties, by counsel, upon the mandate of the United States Court of Appeals for the Fourth Circuit effective November 2, 1990, reversing the judgment of this Court and remanding for further proceedings consistent with the Court's opinion of August 18, 1989. The Court of Appeals ruled that upon remand this Court should afford the City of Norfolk ("the City") a reasonable, specified time to prepare an election plan that will remedy the vote dilution existing in the present plan and to submit such plan for clearance under Section 5 of the Voting Rights Act of 1965, and the Court has determined that the 1990 Census data should be available on or about January 31, 1991, for use in devising a remedial plan and the regularly-scheduled city council elections are not scheduled to be held until May, 1992.

Accordingly, it is hereby ORDERED as follows:

1. Within sixty-five days after receipt of the 1990 Census for the City, the City Council of the City of Norfolk shall duly adopt after opportunity for public comment a remedial election plan and shall submit the same to the United States Department of Justice under Section 5 of the Voting Rights Act. Defendants, through counsel, promptly shall advise counsel for plaintiffs of the date of receipt of such Census data and shall provide plaintiffs' counsel with a copy of such submission to the Justice Department when made.

2. If the Department of Justice preclears the City's plan, defendants' counsel promptly shall so notify plaintiffs' counsel and this Court and defendants shall formally submit the plan for this

Court's consideration. Whereupon, the Court will set a hearing date to hear any objections from the plaintiffs concerning the City's plan and to establish a timetable for the plan's implementation.

3. If the Department of Justice objects to the City's plan, in whole or in part, the court will set a hearing date to consider proposed court-ordered single-member district plans for the conduct of future city council elections. If such objections are subsequently resolved and the plan, as amended, is precleared, defendants may submit the City's plan as precleared to the Court and such plan will be reviewed and considered by the Court as a remedial legislative plan prior to implementation of any proposed court ordered plan. Following adoption of a plan, the Court will establish a timetable for implementation.

4. Defendants are hereby enjoined from conducting at-large elections for the city council under the present plan under which all seven city council members are elected on an at-large basis and from implementation of a new plan until approved by this Court.

(Order Jan. 3, 1991 (*Collins VIII*), Def.'s Mem. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.)

With the concurrence of the *Collins* plaintiffs, the City of Norfolk submitted a proposed election plan to the Department of Justice that provided for a City Council comprised of five single-member wards and two single-member super-wards (the "5–2 plan"). The Department of Justice pre-cleared the proposed plan of the City of Norfolk, and a "Petition for Approval of Remedial Election Plan by the City of Norfolk" was filed with the District Court on June 11, 1991. The Petition indicated

that the plaintiffs had no objection to the 5–2 plan, and requested "the entry of an order in this action approving Ordinance No. 36,374 as the remedial election plan for elections to Norfolk City Council and for entry of a final order of dismissal in this case." (Def.'s Pet. for Approval of Remedial Election Plan, June 11, 1991, *Collins VIII*.)

A hearing on the request of the City of Norfolk for entry of a final order took place on June 24, 1991. At that hearing, counsel for the plaintiffs confirmed that plaintiffs had advised the Department of Justice that they had no objection to the election plan, and then stated that "[t]he only difference that we have this morning, Your Honor, is that plaintiffs believe that it would be possible for the Court to establish a timetable for implementation that would allow this plan to go into effect for the November elections, rather than for next May."[3] (Hr'g Tr., 3, June 24, 1991, *Collins VIII*.) After further argument, the District Court responded that it preferred that the election plan take effect in May of 1992. The proposed "Final Judgment Order" was then presented in open court to counsel for plaintiffs, who noted that he was going to sign it even though he disagreed with the implementation date. (Hr'g Tr., 15–16, June 24, 1991, *Collins VIII*.) The "Final Judgment Order" was entered by the District Court that same day-presumably in open court during the hearing-and provides as follows:

> This day came the plaintiffs and the defendants, by counsel to be heard upon the Petition for Approval of Remedial Election Plan by the City of Norfolk, and was argued by counsel.

---

**3.** As contemplated by the District Court's January 3, 1991 order, the election plan submitted to, and approved by, the Department of

Justice, did not contain an implementation date.

The plan for the election of members to Norfolk City Council as set forth in City Ordinance No. 36,374, adopted by Norfolk City Council on March 26, 1991, having been submitted to the United States Department of Justice, Civil Rights Division, for pre-clearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, pursuant to this Court's Order of January 3, 1991, and it appearing that such pre-clearance has been accomplished as is evidenced by notification dated June 5, 1991, and the Court having reviewed the plan and being of the opinion that such plan is a proper remedial plan and noting that the plaintiffs do not object to the implementation of this plan, it is ORDERED that Ordinance No. 36,374 of Norfolk City Council is hereby approved as a remedy under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and shall be implemented at the next regularly scheduled Norfolk City Council Election set for May 5, 1992.

And it appearing that nothing further remains to be done in this case, the Clerk shall enter this order upon the civil docket book as a Final Judgment Order and shall send a copy to each counsel of record.

(Final J. Order, June 24, 1991, *Collins VIII*, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.)

### B. The 5–2–1 Plan

After May 5, 1992, the City of Norfolk conducted its City Council elections under the 5–2 plan approved by the District Court in the June 24, 1991 "Final Judgment Order." In 2000, the Virginia General Assembly authorized the City of Norfolk to hold an advisory referendum on the question of whether the mayor should be popularly elected.[4] 2000 Va. Acts ch. 950. On July 18, 2000, the Norfolk City Council adopted Ordinance 40,041, calling for such a referendum during the general election of November 2000. The ordinance directed that the referendum question be stated as follows: "Shall the Charter of the City of Norfolk be amended to provide for the mayor of the City to be popularly elected rather than appointed by the members of Council from among its members?" (City of Norfolk Ordinance No. 40.041 at 1, July 18, 2000, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. G, Docket No. 13.) A majority voted "yes" on the referendum question.

On December 21, 2004, the Norfolk City Council adopted Resolution 1,261 requesting that the Virginia General Assembly "amend the Norfolk City Charter so as to allow for the popular election of the Mayor." (City of Norfolk Resolution No. 1,261 at 1, Dec. 21, 2004, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. I, Docket No. 13.) The proposed change retained the existing five single-member wards and two single-member super-wards, but also permitted the Mayor to vote on matters before council, effectively adding an eighth seat to City Council resulting from the election of a mayor by all the voters of the City of Norfolk. *Id.* This resulted in a "5–2–1 plan"-five single-member wards, two single-member super-wards, and one mayor elected city-wide that sat on City Council. The Virginia General Assembly approved the proposed charter change and the Governor signed the change into law in 2005. 2005 Va. Acts ch. 893. The change in the charter was later pre-cleared by the Department of Justice. (Letter from John Tanner, Dep't of Justice, to Paul Jacob, Christian Barton (August 8, 2005), Def.'s Mem. in Supp. of Mot. to Dismiss Ex. J, Docket No. 13.) The City of Norfolk sub-

---

**4.** Under the 5–2 plan, the seven City Council members elected a mayor from among themselves. Therefore, one of the seven City Council members also served as mayor.

sequently conducted an at-large election for mayor in May 2006 and a Caucasian was elected to that post.

### C. The *Collins* Motion

On September 18, 2008, the NAACP filed "Motions to Reopen Case and Enforce Injunctions By Plaintiff Norfolk Branch of the NAACP" in *Collins v. City of Norfolk,* Civil Action No. 83–526N. The Court ordered the reopening of the case for the limited purpose of allowing the filing of the motions and notified the parties that they should file their briefs regarding the motions, which they have done. Oral argument took place on December 15, 2008. Although the Court has issued a separate order addressing the *Collins* motion, such order incorporates and relies upon the Court's analysis of the motion to reconsider set forth below.

### D. The Filing of this Suit

Christina D. Perry–Bey and Roy L. Perry–Bey filed the initial Complaint in this case, styled as a "Motion for Judgment and Injunctive Relief," on April 21, 2008. (Compl., Docket No. 6.) Plaintiffs subsequently requested leave to amend their Complaint and proffered a proposed Amended Complaint. United States District Judge Rebecca Beach Smith's Order of June 11, 2008 made the Amended Complaint the charging document in this litigation, removed Roy Perry–Bey as a party to the case, and made Christina Perry–Bey the sole Plaintiff.[5] (Order, June 11, 2008, Docket No. 21.) The Amended Complaint, like the original Complaint, is styled as a "Motion for Judgment and Injunctive Relief." (Am. Compl., Docket No. 22.)

The Amended Complaint contains two causes of action. The "First Cause of Action" asserts injury as a result of the City of Norfolk's "conducting and implementation of an illegal at large elections [sic] voting for Mayor which minimizes and dilutes minority voting strength and deprives plaintiff's [sic] of an equal opportunity to vote for a candidate of their choice as guaranteed by the Voting Rights Act and Fourteenth and Fifteenth Amendments to the United States Constitution while acting under color of law." (Am. Compl. 2, Docket No. 22.) The "Second Cause of Action" in the Amended Complaint asserts injury as a result of the City of Norfolk's "illegal at large elections of voting [sic] for Mayor [which] violates the mandate in [*Collins v. City of Norfolk,* 883 F.2d 1232 (4th Cir.1989)], and rights secured by the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and of the Fourteenth and Fifteenth Amendments to the United States Constitution and laws." *Id.*[6]

On April 22, 2008, prior to the removal of Roy Perry–Bey as a plaintiff, the Plaintiff's filed a "Motion to Re–Instate Request Motion for Contempt of Court to Issue Show Cause Order." (Docket No. 7.) The motion was followed by the filing, on May 5, 2008, of a proposed order holding the City of Norfolk in civil contempt. The motion for contempt was considered by Judge Smith and, by Order of June 11, 2008, was denied. In the Order of denial, the Court concluded as follows:

> Plaintiffs are within their rights to allege that the current system of electing

---

5. This matter was originally assigned to United States District Judge Walter D. Kelley, Jr. Judge Kelley resigned his commission on May 16, 2008. The matter was reassigned to United States District Judge Rebecca Beach Smith, and later reassigned to the undersigned.

6. Plaintiff also references 42 U.S.C. § 1983 several times in the Amended Complaint. While it is not altogether clear that Plaintiff seeks to state a cause of action under 42 U.S.C. § 1983, the Court will address that statute in its analysis of the motion to dismiss.

the mayor violates a law the Voting Rights Act of 1965. They reach too far, however, in asking the court to hold that defendant has disobeyed the order in *Collins II*. As the court already has explained, the city complied with *Collins II* seventeen years ago. That case is closed. No basis presently exists for holding the city in civil contempt. *See* 18 U.S.C. § 401(3) (defining civil contempt, in part, as "[d]isobedience or resistance to [a court's] lawful . . . order"). The court, therefore, DENIES plaintiffs' contempt motion.

(Order, June 11, 2008, Docket No. 21 at 2.)[7]

On July 11, 2008, Plaintiff filed a "Motion to Reconsider Plaintiff's Motion for Civil Contempt of Court and Issue Show Cause Order as a Matter of Law." (Docket No. 27.) On the same day, the Norfolk Branch of the NAACP filed a Motion for Leave to File as *Amicus Curiae*. (Docket No. 25.) By Order of August 14, 2008, this Court granted the NAACP's motion to file an *amicus curiae* brief and invited the NAACP to participate in oral argument. (Docket No. 34.) Oral argument took place on September 17, 2008. During that oral argument, counsel for the NAACP advised the Court that the NAACP intended to file the above-referenced motion to reopen the *Collins* case and seek an injunction preventing the City of Norfolk from continuing its implementation of the 5–2–1 plan.

## II. Discussion

### A. Motion to Dismiss

The City of Norfolk filed a motion to dismiss Plaintiff Perry–Bey's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(5) and 12(b)(6) on May 14, 2008.[8] (Docket No. 12.) At oral argument on this motion, the City of Norfolk withdrew its motion to dismiss for lack of proper service pursuant to Fed.R.Civ.P. 12(b)(5), and proceeded solely on its Fed. R.Civ.P. 12(b)(6) motion.

The City of Norfolk asserts that the Plaintiff's *pro se* Amended Complaint fails to state a claim for violations of the Voting Rights Act, the Fourteenth Amendment or the Fifteenth Amendment. Specifically, Defendant asserts that Plaintiff: 1) has stated no "facts" supporting her allegations as to counts I and II; 2) has failed to specifically identify which part of the Voting Rights Act she alleges was violated in counts I and II; 3) has failed to specifically allege the three *Gingles* preconditions to pursuing a Section 2 Voting Rights Act claim[9]; 4) has failed to allege that she is a

---

7. The reference to *Collins II* in the June 11, 2008 Order should not be confused with the iteration reference in this Court's procedural history, which adopts the numerical iteration method begun by the Fourth Circuit. Therefore, for purposes of this Opinion and Order, the Court will refer to the District Court orders issued during the final 1991 District Court iteration of the *Collins* litigation as *Collins VIII* orders.

8. Judge Smith's June 11, 2008 Order notes that "Defendant's motion to dismiss addresses the claims made in the complaint and amended complaint," and "[b]ecause the court granted plaintiff's motion to amend, it will consider defendant's motion to dismiss only as it relates to the amended complaint." (Order, June 11, 2008, Docket No. 21 at 3 n. 1.) Therefore, further references are to the Amended Complaint, though the pleading is actually styled as a "Motion for Judgment and Injunctive Relief."

9. The three *Gingles* preconditions to pursuing a Section 2 Voting Rights Act claim that Defendant asserts to be missing are that: a) "the minority group must be sufficiently large and compact to constitute a majority in a single member district," b) "the minority group is politically cohesive," and c) "the majority must vote sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred can-

member of a protected minority; 5) has failed to allege facts supporting intentional discrimination as required for success on her Fourteenth and Fifteenth Amendment claims; 6) has not separated the three claims (Voting Rights Act, Fourteenth Amendment, Fifteenth Amendment) and stated facts in support of each; and, 7) has failed to allege a viable claim for violation of the *Collins* judgment because the *Collins* case is over and there is no continuing jurisdiction by this Court-as recognized by Judge Smith's June 11, 2008 Order. (Mem. in Supp. of Mot. to Dismiss, Docket No. 13.)

Plaintiff responded with various factual and legal allegations that essentially restate the allegations in her Amended Complaint without addressing the substantive arguments contained in the City of Norfolk's motion to dismiss. (Pl.'s Resp. to Mot. to Dismiss, Docket No. 26.) The City of Norfolk replied, asserting that: 1) Plaintiff's response provides "*no* facts whatsoever why the addition of a directly elected mayor violates Section 2 of the Voting Rights Act;" 2) as to count one, the response provides "no facts touching on the three pre-conditions to a Section 2 claim required in" *Gingles;* 3) the response fails to allege "[h]ow the direct election of the mayor is dilutive of minority voting strength when prior to the charter change, the Mayor was appointed, not elected;" and, 4) as to count two, the response continues to assert that the City of Norfolk has violated the "mandate" in *Collins,* despite the fact that Judge Smith ruled that the "city complied with *Collins II* seventeen years ago." (Rebuttal Br., Docket No. 28 at 2–3.)

The *amicus curiae,* NAACP, has also filed a brief regarding the motion to dismiss. The NAACP argues that the City of Norfolk "is subject to a permanent injunction enjoining at-large elections to the Norfolk City Council," resulting from the *Collins* litigation. (*Amicus Curiae* Mem., Docket No. 35 at 2.) The NAACP further argues that "[h]aving a mayor elected at-large to the city council reinstates, at least in part, the method of election that was challenged in *Collins* and found by the Fourth Circuit to be unacceptable." *Id.* at 5. Taking a somewhat different position than the Plaintiff, the NAACP argues that, before changing its method of electing the mayor, the City of Norfolk should have filed a motion pursuant to Fed.R.Civ.P. 60(b)(5) seeking relief from the final judgment in the *Collins* case, and that "[u]nder the circumstances this Court is without the ability to address the effect of adding an at-large seat onto the Council in light of the findings and proscriptions of an earlier court." *Id.* at 9. The NAACP concludes that because the City of Norfolk did not ask the Court for relief from the final judgment in *Collins,* it is "now improper for the City to ask this Court to rule on the validity of an order in another matter," and further "requests that this Court not determine any issue in the present case that is related to the injunction issued in *Collins v. City of Norfolk.*" *Id.*

The City of Norfolk responds to the NAACP brief with many of the same arguments previously noted, but with an additional discussion of the manner in which the pre-clearance procedure in Section 5 of the Voting Rights Act interacts with orders for a remedial election plan under Section 2 of the Voting Rights Act.[10]

didate." *Gingles,* 478 U.S. at 50–51, 106 S.Ct. 2752.

**10.** In the *Collins* matter, the City of Norfolk also argues that the *Collins* plaintiffs are pre-

cluded from seeking relief because they are barred by the doctrine of laches for having waited too long to seek such relief. Because of the Court's ruling on the motion to reconsider, and the corresponding motion to en-

(Def.'s Reply Br. to *Amicus Curiae,* Docket No. 30.)

### 1. standard for consideration of motion to dismiss

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to request dismissal of the claims against him if the plaintiff has filed a claim upon which relief cannot be granted. Fed.R.Civ.P. 12(b)(6). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).

"[A] Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999). Additionally, a complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). As the *Bell Atlantic* Court explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 1964–65. Accordingly, in *Bell Atlantic,* the Court upheld the dismissal of a complaint where the plaintiffs failed to "nudge[ ] their claims across the line from conceivable to plausible." *Id.* at 1974.

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), so as "to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic,* 127 S.Ct. at 1964. A court relies primarily on the allegations in the complaint when considering a Rule 12(b)(6) motion, but may also consider documents attached to the complaint and incorporated by reference. *Simons v. Montgomery County Police Officers,* 762 F.2d 30, 31–32 (4th Cir.1985). *Simons* documents may include undisputed public documents and copies of case law. *Id.; see also Hall v. Commonwealth of Virginia,* 276 F.Supp.2d 528, 531 (E.D.Va.2003).

The Court also notes that Plaintiff is representing her own interests and proceeding *pro se,* having disclaimed any interest in having counsel represent her when questioned by the Court about such possibility at oral argument. While *pro se* plaintiffs are not relieved of the obligation to provide sufficient factual allegations for a defendant to respond, they are entitled to have their pleadings held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citation omitted).

In this case, Plaintiff is therefore required to state her claim so as to give the Defendant fair notice of its nature and the grounds upon which it rests, with enough factual allegations to state a claim to relief that is plausible, not merely speculative.

force judgment in the *Collins* matter, it is not necessary for the Court to address that argument.

## 2. standing to sue

■ Plaintiff alleges injury as a result of Defendant conducting "at large elections voting for Mayor which minimizes and dilutes minority voting strength and deprives plaintiffs of an equal opportunity to vote for a candidate of their choice as guaranteed by the Voting Rights Act and Fourteenth and Fifteenth Amendments to the United States Constitution while acting under color of law." (Am. Compl. ¶ 5, Docket No. 22.) Defendant asserts that if Plaintiff is attempting to assert a Section 2 Voting Rights Act claim for vote dilution arising from racial bloc voting, she has filed a claim upon which relief cannot be granted because she does not allege that she is a member of a protected minority.

Plaintiff is attempting to assert constitutional and statutory claims for vote dilution arising from racial bloc voting. By raising Plaintiff's failure to assert membership in a protected class, Defendant questions whether she has been injured as a result of the alleged vote dilution. Stated another way, Defendant challenges Plaintiff's standing to sue. Such a standing challenge may be raised by filing a motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6) for failure to state a claim, as Defendant has done. *See Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 594 n. 2 (2d Cir.1993).

Standing is a concept utilized to determine if a party is sufficiently affected so as to insure that a justiciable controversy is presented to a court. The Court is aware that Defendant has challenged Plaintiff's standing **only** with respect to whether she is a member of a protected class for purposes of asserting vote dilu-

tion based upon racial bloc voting.[11] Nonetheless, if there are other standing deficiencies, they are not subject to waiver. *United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ("[I]t is the burden of the 'party who seeks the exercise of jurisdiction in his favor[,] clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.' "). A district court is therefore required to address all deficiencies affecting standing, even if they are not raised by the parties, because federal courts are under an obligation to examine their own jurisdiction-and standing is among the most important components of jurisdiction. *Id.* Therefore, the Court must determine whether there are any standing issues other than the one (membership in a protected class) asserted by Defendant. However, before doing so, it is important to understand the requirements of standing.

The Court is essentially concerned with two different components of standing.

> In analyzing the standing requirements, the Supreme Court has formulated a two-component framework, consisting of "irreducible" constitutional requirements and sub-constitutional prudential, that is, judge made, considerations. The two branches of the standing requirement differ both in analytical and consequential terms. Constitutional standing is grounded in Article III's provision that limits the jurisdiction of federal courts to those litigants best suited to assert a particular claim. In contrast, prudential limitations on standing are judge-made and designed to limit access to the federal courts to those litigants best suited

---

**11.** Having submitted no affidavits, testimony or other materials, Defendant is making a facial attack on standing, rather than a factual attack. Where such a facial attack is made, the Court looks to the sufficiency of the alle-

gations in the Amended Complaint. *Russell v. Choicepoint Services, Inc.*, 302 F.Supp.2d 654, 663 (E.D.La.2004). The same standard applies to the additional standing deficiencies raised by the Court.

to assert a particular claim. Thus, because prudential limits are not dictated by the Constitution, they are subject to reversal by Congress. Standing limits derived from Article III, on the other hand, of course are not subject to congressional repeal.

15 James Wm. Moore et al., *Moore's Federal Practice* § 101.22 (3d ed. 2008) (internal citations omitted); *see Frank Krasner Enters. v. Montgomery County,* 401 F.3d 230, 234 (4th Cir.2005).

■ Constitutional standing, as noted above, is an issue of subject matter jurisdiction because it goes to the existence of a "case or controversy," which is a prerequisite to Article III jurisdiction described in the United States Constitution. *See Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates, Co.,* 436 F.3d 82, 84–85 (2d Cir.2006). In *Lujan v. Defenders of Wildlife,* the Supreme Court noted that Article III constitutional standing includes three elements:

First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be addressed by a favorable decision.

504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (footnote, citations, and internal quotation marks omitted); *Burke v. City of Charleston,* 139 F.3d 401, 405 (4th Cir.1998). The Supreme Court has repeatedly refused to recognize generalized grievances against alleged illegal government conduct as sufficient to establish federal jurisdiction. *Lance v. Coffman,* 549 U.S. 437, 442, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *see Winstead v. Stodola,* No. 4:07cv682WRW, 2007 WL 2710096, at *1, 2007 U.S. Dist. LEXIS 68049, at *4 (E.D.Ark. Sept. 13, 2007). Furthermore, the burden of proof is on the party invoking a district court's jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Therefore, plaintiffs are required to allege facts demonstrating that they are the proper parties to request judicial resolution of a dispute before a court. *Warth v. Seldin,* 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ The Court may also need to address prudential standing considerations. However, "[w]here Congress has expressly conferred standing by statute, prudential standing concerns are superseded." *Gen. Instrument Corp. v. Nu–Tek Elecs. & Mfg.,* 197 F.3d 83, 88 (3d Cir.1999) (citing *Warth,* 422 U.S. at 501, 95 S.Ct. 2197). Therefore, as a matter of statutory interpretation, Congress is presumed to have incorporated background prudential considerations, unless the statute expressly negates them. *Conte Bros. Auto., Inc. v. Quaker State–Slick 50, Inc.,* 165 F.3d 221, 224 (3d Cir.1998).

The Court must review each of Plaintiff's claims to determine whether she has standing to assert the claim. In her Amended Complaint, Plaintiff attempted to assert statutory claims based on the Voting Rights Act and 42 U.S.C. § 1983. If the relevant statutes confer standing expressly, then only constitutional standing concerns remain because prudential standing considerations are superceded. For the reasons discussed in detail later in this opinion, the only viable statutory claim

that Plaintiff has made is based upon the Voting Rights Act, which is examined below.[12]

■ The Voting Rights Act creates a private cause of action permitting plaintiffs to file suit if they are an "aggrieved person." 42 U.S.C. § 1973a. Because a "party who fulfill[s] the injury-in-fact prong of the constitutional standing requirements would also be a 'person aggrieved' and would therefore fulfill the plain language of the statute," this Court need only examine the requirements of constitutional standing with respect to the Voting Rights Act claim. *Gen. Instrument Corp.*, 197 F.3d at 88 (construing "any person aggrieved" in standing context); *see Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 328–29, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (Congress' use of "any person aggrieved" in the Census Act "eliminated any prudential concerns in [that] case"); *Sioux Falls Cable Television v. South Dakota*, 838 F.2d 249, 252 (8th Cir.1988) (phrase "any person aggrieved" is "ordinarily sufficient to confer standing on any party satisfying the constitutional requirements"). In addition, if Plaintiff satisfies the constitutional standing requirements for a vote dilution claim under the Voting Rights Act, she also satisfies the constitutional standing requirements for a vote dilution claim under the Fourteenth and Fifteenth Amendments. *Parker v. Ohio*, 263 F.Supp.2d 1100, 1107 (S.D.Ohio 2003), *aff'd*, 540 U.S. 1013, 124 S.Ct. 574, 157 L.Ed.2d 426 (2003) (noting that same standing rules applicable to Fourteenth Amendment election case should apply to claims under Section 2 of Voting Rights Act "which was enacted to enforce the guarantees of the Fourteenth and Fifteenth Amendments"); *see Casaburro v. Volusia County Corp.*, No. 6:07–cv–56–ORL–KRS, 2008 WL 1771774, at \*3, 2008 U.S. Dist. LEXIS 31070, at \*7 (M.D.Fla. Apr. 15, 2008) (finding no standing under Voting Rights Act or Fifteenth Amendment because of plaintiff's failure to allege they were personally discriminated against based on "race, color or a previous condition of servitude"); *Gonzales v. City of Aurora*, No. 02–C–8346, 2006 WL 681048, at \*2 n. 2, 2006 U.S. Dist. LEXIS 10677, at \*5 n. 2 (N.D.Ill. Mar. 13, 2006) (assuming that test for standing under Voting Rights Act is same as for Fourteenth Amendment). Therefore, the Court will only directly address constitutional standing under the Voting Rights Act.

a. failure to allege facts supporting vote dilution

The Voting Rights Act was originally understood to confer standing in express terms only upon the Attorney General of the United States. *See Conway Sch. Dist. v. Wilhoit*, 854 F.Supp. 1430, 1432 (E.D.Ark.1994) (noting express language conferring standing in original statute). However, in *Allen v. State Bd. of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Supreme Court held that private litigants attempting to protect their voting rights were also proper parties and found that there was standing for voters "seeking judicial enforcement of the prohibition" against infringements upon the right to vote based on race. *Id.* at 557, 89 S.Ct. 817. Congress then amended the Voting Rights Act to explicitly confer

---

**12.** It is unnecessary to address Section 1983 standing requirements because the Court is unable to discern the exact parameters of Plaintiff's Section 1983 claim. However, to the extent that Plaintiff's Section 1983 claim is a vote dilution claim, and to the extent it could thus survive (which is doubtful), the constitutional standing requirement would be the same for the Section 1983 claim as for the Voting Rights Act, Fourteenth and Fifteenth Amendment claims.

standing on "aggrieved persons" to enforce their voting rights. 42 U.S.C. § 1973a.

■ Standing to bring suit under the Voting Rights Act is now limited to the Attorney General and "aggrieved persons." *Roberts v. Wamser*, 883 F.2d 617, 624 (8th Cir.1989).[13] "[A]ggrieved persons" are those whose "voting rights have been denied or impaired." *Id.* The original purpose of the Voting Rights Act was to protect minority voters. *Roberts*, 883 F.2d at 621 ("The purpose of the Voting Rights Act is to protect minority voters...."); *White–Battle v. Democratic Party of Virginia*, 323 F.Supp.2d 696, 703 (E.D.Va.2004) ("the purpose of the Voting Rights Act is to protect minority voters...."); *Newman v. Voinovich*, 789 F.Supp. 1410, 1415–16 (S.D.Ohio 1992) (white plaintiff had no standing to represent rights of minority population in Voting Rights Act claim). Furthermore, the language in Section 2 of the Voting Rights Act bears this out, prohibiting practices or procedures that result in a denial or abridgement of the right to vote "on account of race or color." 42 U.S.C. § 1973(a).

Plaintiff seeks to assert a vote dilution claim based upon racial bloc voting arising from an alleged at-large election method. In order to do so, she must have suffered an "injury in fact." *Gingles*, 478 U.S. at 74, 106 S.Ct. 2752 (when addressing vote dilution claim based upon at-large voting, Court summarized holding by saying "we would hold that the legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only to the exis-

tence of a correlation between the race of voters and the selection of certain candidates"). However, as Defendant has pointed out, while Plaintiff has alleged that the new method of electing the mayor "dilutes minority voting strength," in her effort to allege an actual and concrete invasion of a protected interest, she has not alleged her race or that she is a member of a minority whose voting strength was diluted. (Am. Compl. ¶ 5, Docket No. 22.) Because the explicit language of the Voting Rights Act requires that alleged abridgement arise on account of race or color, and because the Supreme Court has read the Voting Rights Act to protect minority rights in vote dilution claims, Plaintiff's Amended Complaint is constitutionally and statutorily deficient for failure to allege an actual and concrete invasion of a protected interest. It fails to allege that she is a member of a minority group and that her right to vote has been abridged on account of her race or color, thus suffering a constitutional injury in fact.

### b. failure to allege status as registered voter

■ As the Court explained above, any other standing deficiencies must be addressed, even if not raised by the Defendant. While the Amended Complaint states that Plaintiff is a "resident of the City of Norfolk and of the Commonwealth of Virginia and a citizen of the United States of America," it contains no allegation that Plaintiff is a registered voter in the City of Norfolk. *Id.* at ¶ 3. Logic dictates that if the Voting Rights Act was

**13.** The *Roberts* court explained:

We conclude that an unsuccessful candidate attempting to challenge election results does not have standing under the Voting Rights Act. Although the "aggrieved person" language might be stretched to include an unsuccessful candidate such as Roberts, we are unconvinced that Congress

intended it to be stretched that far. The purpose of the Voting Rights Act is to protect minority voters, not to give unsuccessful candidates for state or local office a federal forum in which to challenge elections.

*Roberts*, 883 F.2d at 621.

intended to, among other things, provide "stringent new remedies against those practices which have most frequently denied citizens the right to vote on the basis of their race," *Allen*, 393 U.S. at 548, 89 S.Ct. 817, then requiring citizens to allege they are a registered voter might close the courthouse doors to them if the basis of their claim was an unjustified refusal to allow them to register. In other words, such persons could suffer an injury in fact even if they were unregistered. But here, plaintiff does not allege such a voter registration violation. She alleges a dilution of minority voting strength as a result of the adoption and use of the 5–2–1 plan, and inferentially, dilution of her own vote. Therefore, because Plaintiff has failed to allege that she is a registered voter, she cannot have suffered a constitutional injury in fact by having her vote diluted. Having failed to allege her status as a registered voter, Plaintiff has not alleged facts that show she has standing to make her claim. *Williams v. Bolivar County*, No. 2:04cv282, 2007 WL 313840, at *3, 2007 U.S. Dist. LEXIS 6715, at *8–9 (N.D.Miss. Jan. 29, 2007) (no standing where plaintiff not a registered voter); *Chen v. City of Houston*, 9 F.Supp.2d 745, 750 (S.D.Tex.1998) (no standing where plaintiff not registered to vote); *Fairley v. Forrest County*, 814 F.Supp. 1327, 1329 (S.D.Miss.1993) (plaintiff not registered voter and could not "complain of election results from an election in which she was not qualified to participate because of her own inaction").[14]

#### c. ward residence

■ The final area of inquiry for standing purposes involves the ward in which Plaintiff resides. Plaintiff only states that she is a resident of Norfolk. She does not

indicate in which ward she resides, or by which members of City Council she is represented. Plaintiff's basic allegation regarding her residency in the City of Norfolk may be sufficient for some purposes and not for others.

Plaintiff's Amended Complaint can potentially be read as an allegation that the addition of the mayor to City Council under the 5–2–1 plan dilutes minority voting strength throughout the City of Norfolk. To that extent, it might be said that all minority voters in Norfolk have standing to assert an injury. However, the Amended Complaint can also be interpreted to the effect that the addition of the mayor to City Council means that there are now three minority council members out of eight, whereas before the change to the 5–2–1 plan, there were three minority council members out of seven, thereby diluting the voting strength of the minority members on City Council and their constituents. This is the interpretation suggested by *amicus curiae* NAACP at oral argument. Such a claim would require Plaintiff to allege that she was a registered voter in a minority-represented ward, and that she suffered injury when her elected representative's power was reduced by the addition of the new popularly-elected mayor to City Council. *Winstead*, 2007 WL 2710096, at *2–3, 2007 U.S. Dist. LEXIS 68049, at *7–8 (allegation that new powers of mayor increased his power, and the power of at-large representatives, to detriment of minority-ward representatives, required assertion that plaintiff voted in a minority ward); *see Hays*, 515 U.S. at 745, 115 S.Ct. 2431 (where plaintiff does not allege she lives in a district suffering representational harm, she does not suffer a racial classification harm for standing purposes). Plaintiff has failed to make such allega-

---

**14.** To the extent that Plaintiff were to allege she is a registered voter, that would address

any concerns as to the absence of any allegation that she is of voting age.

tions regarding her ward residence, and she has therefore failed to assert a constitutional injury in fact because she did not assert an actual and concrete invasion of a legally protected interest.

Affording this *pro se* Plaintiff's Amended Complaint the careful reading to which it is entitled, the Court finds that Plaintiff has failed to allege sufficient facts to show that she has standing to assert the claims in her Amended Complaint. Accordingly, Plaintiff's Amended Complaint is **DISMISSED** without prejudice. Because this dismissal is without prejudice to Plaintiff's right to amend, the Court will address the remaining arguments.

3. Constitutional and statutory claims

Several amendments in the United States Constitution restrict the power of the states to place qualifications on the exercise of the right to vote. Among these protections are the Equal Protection Clause of the Fourteenth Amendment, and the Fifteenth Amendment's denial to federal and state governments of power to deprive a citizen of the right to vote on account of race, color, or previous condition of servitude. *See* Joseph G. Cook, *Civil Rights Actions* § 3–18, at 18.01 (2008) (containing thorough discussion of such protections).

While the Fourteenth and Fifteenth Amendments are self-executing, each of these amendments authorizes Congress to enforce their substantive proscriptions "by appropriate legislation." *Id.* Congress has enacted legislation to protect these rights, including the Enforcement Act of 1870, 16 Stat. 140, the Civil Rights Act of 1957, Pub. L. No. 85–315, 71 Stat. 634, the Civil Rights Act of 1960, Pub. L. No. 86–449, 74 Stat. 86, and the Civil Rights Act of 1964, Pub. L. No. 88–352, 78 Stat. 241. *Id.* Due to a lack of progress resulting from these statutes, Congress enacted the Voting Rights Act of 1965 pursuant to its authori-

ty under the Fourteenth and Fifteenth Amendments. Voting Rights Act of 1965, Pub. L. No. 89–110, 79 Stat. 437 (codified as amended at 42 U.S.C. §§ 1971, 1973 to 1973bb–1 (1994)). *Id.*

With this constitutional and statutory history in mind, and after careful review of Plaintiff's Amended Complaint, the Court construes the Amended Complaint as an effort to allege the following causes of action: 1) a violation of the Fourteenth Amendment, 2) a violation of the Fifteenth Amendment, 3) a violation of the Voting Rights Act of 1965, and 4) a violation of 42 U.S.C. § 1983. Plaintiff's effort to allege each of these claims is addressed below.

a. Fourteenth Amendment

The Court construes Plaintiff's allegation of a Fourteenth Amendment violation as falling under the Equal Protection Clause due to Plaintiff's statement in paragraph five that she has been deprived of "an equal opportunity to vote for a candidate of [her] choice as guaranteed by the [...] fourteenth [...] amendment[ ] while acting under color of state law." (Am. Compl. ¶ 5, Docket No. 22.)

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. In the context of elections, it is well established that the protection of this amendment applies to state and local elections. *Avery v. Midland County*, 390 U.S. 474, 481, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (because state governments exercise extensive power over their units of local government, "[w]e therefore see little difference, in terms of the application of the Equal Protection Clause and of the principles of *Reynolds v. Sims*, [377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)], between the exercise of state power through

legislatures and its exercise by elected officials in the cities, towns, and counties"). In addition to the clear textual provisions in the Constitution that protect the right to vote, the Supreme Court has repeatedly declared that the right to vote is a fundamental right protected under the Equal Protection Clause, even though the clause itself does not specifically mention voting. *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

Recognizing the importance of the right to vote, the Supreme Court has explained that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362. "[A]ny unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government." *Kramer*, 395 U.S. at 626, 89 S.Ct. 1886. Furthermore, the right to vote is a "fundamental political right" because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Laws infringing on the right to vote must, therefore, meet strict constitutional scrutiny. *Harper*, 383 U.S. at 667, 86 S.Ct. 1079. As the Supreme Court explained in *Harper*, "[e]specially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.*

Employing such careful scrutiny, the Equal Protection Clause forbids certain forms of classification that cannot be justified by compelling or important governmental objectives. *Black v. McGuffage*, 209 F.Supp.2d 889, 897 (N.D.Ill.2002). The Supreme Court has constructed a system of varying levels of scrutiny depending on the classification involved. *Id.* (reviewing the various classifications). Therefore, the first question that must be asked when evaluating an equal protection claim, is whether there is a classification. *Id.*

■■■■ There are two basic types of Equal Protection classifications. The first type of classification occurs when the classification exists on the face of the law at issue. For example, a law that only people of a specific race can operate a motor vehicle is obviously a racial classification existing on the face of the law. The second type of classification occurs when a law is neutral on its face, but has a discriminatory impact or effect from the administration of that law. Erwin Chemerinsky, *Constitutional Law, Principle and Policies* § 9.1.2 (2d ed. 2002). Demonstrating such a race classification in the constitutional Equal Protection arena requires proof that there is a discriminatory purpose behind the law. *Mobile v. Bolden*, 446 U.S. 55, 66, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Therefore, laws neutral on their face, but which happen to have a disparate impact on certain groups, do not necessarily violate the Equal Protection Clause absent such discriminatory purpose. *Black*, 209 F.Supp.2d at 897 (citing *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)).

■■■■ Accordingly, to make out a Fourteenth Amendment Equal Protection claim against voting laws that are neutral on their face, there must be an allegation that the challenged practice was conceived or operated as a purposeful device to further racial discrimination. As the Supreme Court noted in *Mobile*, 446 U.S. at 66, 100 S.Ct. 1490:

Despite repeated constitutional attacks upon multimember legislative districts, the court has consistently held that they are not unconstitutional *per se, e.g., White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314; *Whitcomb v. Chavis* [403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363], *supra; Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771; *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376; *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401. We have recognized, however, that such legislative apportionments could violate the Fourteenth Amendment if their purpose were invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. *See White v. Regester, supra; Whitcomb v. Chavis, supra; Burns v. Richardson, supra; Fortson v. Dorsey, supra.* To prove such a purpose it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. *White v. Regester, supra,* at 765–766, 93 S.Ct. 2332; *Whitcomb v. Chavis,* 403 U.S. at 149–150, 91 S.Ct. 1858. A plaintiff must prove that the disputed plan was "conceived or operated as [a] purposeful [device] to further racial ... discrimination," *id.,* at 149, 91 S.Ct. 1858.

This burden of proof is simply one aspect of the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597; *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870. The Court explicitly indicated in *Washington v. Davis* that this principle applies to claims of racial discrimination affecting voting just as it does to other claims of racial discrimination.

*Mobile,* 446 U.S. at 66–67, 100 S.Ct. 1490; *Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 481–82, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) ("[s]ince 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the state or political subdivision acted with a discriminatory purpose"); *Rogers v. Lodge,* 458 U.S. 613, 617–19, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) ("in order for the Equal Protection Clause to be violated, 'the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose' "). The required discriminatory intent need not be proved by direct evidence, it "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Rogers,* 458 U.S. at 618, 102 S.Ct. 3272.

■ With those principles in mind, the Court must examine Plaintiff's allegations. Because the 5–2–1 plan clearly contains no classification on its face, Plaintiff must, if at all, allege an adverse impact or effect from the administration of the facially-neutral plan. Plaintiff alleges that she has been deprived of "an equal opportunity to vote for a candidate of [her] choice as guaranteed by the [ ... ] fourteenth [ ... ] amendment [ ] while acting under color of state law." (Am. Compl. ¶ 5, Docket No. 22.) This language, when combined with Plaintiff's allegation that the election of the mayor "minimizes and dilutes minority voting strength," is enough to put Defendant on notice that she is alleging that the 5-2-1 plan has a discriminatory impact. But, this language is devoid of any allegation that the Defendants **intended** to discriminate against minority voters. Ac-

cordingly, because of such deficiency, even if Plaintiff had standing, Plaintiff's Fourteenth Amendment claim would be **DISMISSED** without prejudice.

### b. Fifteenth Amendment

The Court further construes Plaintiff's Amended Complaint as an allegation of a Fifteenth Amendment violation because of the statement in her "First Cause of Action" that she was injured as a result of the City of Norfolk's "implementation of an illegal at large elections voting for Mayor which minimizes and dilutes minority voting strength and deprives plaintiff's [sic] of an equal opportunity to vote for a candidate of their choice as guaranteed by the ... Fifteenth Amendment[ ] to the United States Constitution." (Am. Compl., Docket No. 22, at 2.)

Section 1 of the Fifteenth Amendment provides that: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV § 1. The Supreme Court addressed the Fifteenth Amendment's application to vote dilution cases in *Mobile,* 446 U.S. at 61–62, 100 S.Ct. 1490. In *Mobile,* the Supreme Court noted that the Fifteenth Amendment does not confer the right to vote upon any one, but it has "invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude." *Id.* The Supreme Court further noted that "action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose." *Id.* The Court went on to state that the amendment "prohibits only purposefully

discriminatory denial or abridgment by government of the freedom to vote 'on account of race, color, or previous condition of servitude.'" *Id.* at 65, 100 S.Ct. 1490. Therefore, it is clear that proof of racially motivated discrimination is a necessary element in a Fifteenth Amendment vote dilution claim.

As noted above, the language of Plaintiff's Amended Complaint is devoid of any allegation that the City of Norfolk intended to discriminate against minority voters. Accordingly, even if Plaintiff had standing, Plaintiff's Fifteenth Amendment claim would be **DISMISSED** without prejudice.

### c. Voting Rights Act of 1965

Despite the protections of the Fourteenth and Fifteenth Amendments, and the voting rights provisions of the 1957, 1960, and 1964 Civil Rights Acts, initially "little progress was made towards enfranchising African–American voters, particularly in the [southern United States]." Cook, *supra,* § 3–18 at 18.02 (citing H.R. Rep. No. 439, 89th Cong., 1st Sess. 9–11 *reprinted in* 1965 U.S.C.C.A.N. 2440–42). Because of this lack of progress, Congress enacted the Voting Rights Act of 1965 pursuant to its authority under the Fourteenth and Fifteenth Amendments to enact "appropriate legislation" enforcing such amendments. Voting Rights Act of 1965, Pub.L. No. 89–110, 79 Stat. 437 (codified as amended at 42 U.S.C. §§ 1971, 1973 to 1973bb–1 (1994)). The most significant provisions of the original Act are aimed at those states and political subdivisions where Congress concluded that literacy tests and other voter qualification devices were being used to discriminate on the basis of race. *Id.*

The 1965 Act has been amended several times, including in 1982, when Congress substantially amended Section 2 in re-

sponse to the Supreme Court's opinion in *Mobile.* The original version of Section 2 provided that:

> No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any state or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

Voting Rights Act of 1965, Pub.L. No. 89–110, 79 Stat. 437. In *Mobile,* the plaintiffs asserted constitutional and Section 2 challenges to a multi-member election system on the ground that it diluted the voting strength of African–American voters. *Mobile,* 446 U.S. at 58, 100 S.Ct. 1490. The Supreme Court held that Section 2, like the Fourteenth and Fifteenth Amendments, is violated only if a multi-member district was conceived or operated as a **purposeful** device to further racial discrimination. *Id.* The Court said that a racially discriminatory impact or effect was not enough to establish a constitutional violation or a violation of Section 2 of the Voting Rights Act of 1965. *Id.*

The 1982 amendment to Section 2 effectively overturned the Supreme Court's construction of the Voting Rights Act in *Mobile* as requiring proof of intentional discrimination.[15] The 1982 amendment was for the express purpose of making clear that the discriminatory result of the challenged practice-without explicit proof of any kind of discriminatory purpose-is sufficient to establish a violation of the

section. *See* Sen. Rep. No. 417, 97th Cong., 2d Sess. 27–30, reprinted in 1982 U.S.C.C.A.N. 177, 204–08. However, Congress also specifically stated that, by enacting the amendment, it did not intend to establish any right to proportional representation. As revised, Section 2 provides that:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That

15. Prior to *Mobile,* courts required plaintiffs to show that the representational system, considered under the totality of the circumstances, served "to cancel out or minimize the voting strength of racial groups." *White v. Regester,* 412 U.S. 755, 765, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). This changed with *Mobile,* which required a heightened showing that a representational system challenged under Section 2 was intentionally discriminatory. By the time that Congress had decided to

amend Section 2 to reverse the holding *of Mobile,* the Supreme Court decided *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), striking down an at-large election system on the basis of an "intent" analysis that bore a strong resemblance to the old totality of the circumstances approach. Lowenstein, Hasen & Tokaji *Election Law-Cases and Materials* 144 (4th ed. 2008).

nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

The Voting Rights Act of 1965 is a broad remedial statute, which the Supreme Court has emphasized "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). However, a defendant has a right to require that a claim under the Voting Rights Act is properly pled such that the defendant knows what is being claimed. The Federal Rules of Civil Procedure provide a mechanism in Rule 12(b)(6) for determining whether a plaintiff has properly pled such a claim.

A Rule 12(b)(6) motion is intended to test the legal sufficiency of the complaint, but the complaint need only set forth "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C.Cir.2003), giving the defendant fair notice of the claim and the grounds upon which it rests. *Erickson*, 127 S.Ct. at 2200.

As discussed in more detail above, "[f]actual allegations must be enough to raise a right above the speculative level" and have "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 127 S.Ct. at 1965. "When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 127 S.Ct. at 2200. Furthermore, a *pro se* complaint must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." *Id.*

 Bearing these principles in mind, the Court turns to the statutory elements of a Section 2 claim under the Voting Rights Act of 1965. "There are two statutory elements to a claim under Section 2:(1) the use of an electoral 'standard, practice or procedure,' and (2) a resulting diminution of the opportunity to African American and Latino voters 'to participate in the political process and to elect representatives of their choice.'" *Black*, 209 F.Supp.2d at 896; *Kingman Park*, 348 F.3d at 1040 ("[i]n order to survive a motion to dismiss under Rule 12(b)(6), appellants were required only to allege that the Ward Redistricting Act dilutes minority voting strength such that minority voters in the relevant wards have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice'"). However, a plaintiff in a Section 2 case is "not required on the face of their complaint to allege every legal element or fact that must be proven in a vote dilution claim." *Kingman Park*, 348 F.3d at 1040.[16]

 Plaintiff's Amended Complaint references 42 U.S.C. § 1973, which is part

---

**16.** The City of Norfolk asserts that Plaintiffs Amended Complaint is insufficient under Rule 12(b)(6) because, among other things, it fails to assert the allegations that the Supreme Court's *Gingles* decision said must be shown in order to prevail on a Section 2 claim. In support of this argument, the City of Norfolk cites *Maxey v. Cuomo*, 91 Civ. 7328(TPG), 1996 WL 529024, at *4, 1996 U.S. Dist. LEXIS 13594, at *11 (S.D.N.Y. Sept. 18, 1996).

To the extent that *Maxey* stands for the proposition that a plaintiff in a Section 2 Voting Rights Act case must allege more than is required by the Act itself, the Court finds such suggestion inconsistent with the notice pleading requirement in Fed.R.Civ.P. 8(a)(2), this Circuit's precedent, and the Supreme Court's recent decision in *Bell Atlantic*, 127 S.Ct. at 1965.

of the codification of the Voting Rights Act, as one basis for this Court's jurisdiction, and also identifies the first required element: an electoral "standard, practice, or procedure." 42 U.S.C. § 1973(a). In her first cause of action, Plaintiff alleges that the City of Norfolk has engaged in "conducting and implementation of an illegal at large elections voting for Mayor." (Am. Compl. ¶ 5, Docket No. 22.) By doing so, she has identified a "standard, practice, or procedure" under Section 2. *Black*, 209 F.Supp.2d at 896 (identification of deficient ballot systems satisfies first element).

■ Plaintiff's Amended Complaint also identifies the second required element: a resulting diminution of the opportunity of African–American voters "to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). In her first cause of action, Plaintiff alleges that the at-large election of the mayor "minimizes and dilutes minority voting strength and deprives plaintiff's of an equal opportunity to vote for a candidate of their choice." (Am. Compl. ¶ 5, Docket No. 22.) As the Court noted in *Black*, allegations of "[d]iscriminatory results in an election practice have been found sufficient to state a Section 2 violation." *Black*, 209 F.Supp.2d at 897 (citing *Burton v. City of Belle Glade*, 178 F.3d 1175, 1196 (11th Cir.1999)). Therefore, Plaintiff has stated a Section 2 Voting Rights Act claim. Of course, as the court noted in *Black*, the " 'totality of circumstances' requiring analysis under Section 2 cannot be fully ascertained in this case except through discovery and possibly trial." *Black*, 209 F.Supp.2d at 897. While Defendant's motion to dismiss on these grounds is **DENIED,** for the reasons stated above with respect to standing, Defendant's motion to dismiss this claim, and all other claims, is **GRANTED,** and the Vot-

ing Rights Act claim is therefore **DISMISSED** without prejudice.

### d. 42 U.S.C. § 1983

■ Plaintiff's Amended Complaint contains two separate sections entitled "First Cause of Action" and "Second Cause of Action." Nonetheless, Plaintiff seeks to allege three violations in those two sections: one under the Fourteenth Amendment, one under the Fifteenth Amendment, and one under the Voting Rights Act of 1965. Less clear are Plaintiff's allegations with respect to 42 U.S.C. § 1983.

In the section of the Amended Complaint entitled "Introduction," Plaintiff states that "the current new illegal plan of at large elections voting for Mayor violate *Collins*, 883 F.2d 1232: 1989 U.S.App. LEXIS 12398, and discriminates, minimizes and dilutes minority voting strength in violation of Fourteenth and Fifteenth Amendments to the United States Constitution, Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. 1973, and 42 U.S.C.1983." (Am. Compl., Docket No. 22 at 1.) Under the section of the Amended Complaint entitled "Jurisdiction," Plaintiff asserts that the Court has jurisdiction "pursuant to ... 42 U.S.C. § 1983." *Id.* In the section entitled "Relief Requested," Plaintiff fails to mention 42 U.S.C. § 1983. *Id.* at 3. Therefore, while Plaintiff could have been clearer, it appears she may have sought to allege a cause of action pursuant to 42 U.S.C. § 1983. However, since that statute provides no substantive rights, and only provides a vehicle for redress of rights that are otherwise created by federal law, it is less than clear which rights Plaintiff is addressing by reference to 42 U.S.C. § 1983.

Although Defendant's motion to dismiss requests dismissal of the entire Amended

Complaint, it is perhaps because of the lack of clarity in Plaintiff's Amended Complaint that Defendants have not specifically addressed her efforts to state a cause of action under 42 U.S.C. § 1983. Because the Court's dismissal of Plaintiff's Fourteenth Amendment, Fifteenth Amendment, and Voting Rights Act claims is without prejudice to her right to seek amendment, the Court will also here address her references to 42 U.S.C. § 1983.

As a general matter, 42 U.S.C. § 1983 authorizes a court to grant relief when a party's federally protected rights have been violated by a state or local official or other person who acted under color of state law. Martin A. Schwartz, *Section 1983 Litigation* § 1.01[A] (2008). The statute is derived from § 1 of the Civil Rights Act of 1871. 17 Stat. 13 (1871); *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . .

42 U.S.C. § 1983.

As discussed above, under the Federal Rules of Civil Procedure, a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). This liberal standard of notice pleading applies in all civil actions other than those specifically excepted by the Federal Rules of Civil Procedure or statutory law. *Swierkiewicz v. Sorema*, 534 U.S. 506, 513,

122 S.Ct. 992, 152 L.Ed.2d 1 (2002). The Fourth Circuit has recognized that there is no such exception for § 1983 actions. *Hatfill v. New York Times*, 416 F.3d 320, 330 (4th Cir.2005). Therefore, a plaintiff in a § 1983 civil rights action does not need to plead specific facts; rather, the complaint must only meet the liberal standard of notice pleading and give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Thomas v. Independence Twp.*, 463 F.3d 285, 295 (3d Cir.2006).

Plaintiff has really done nothing more than insert a reference to the statute in her Amended Complaint. Even considering the liberal notice pleading standard that applies, it cannot be said that Plaintiff's cursory reference to 42 U.S.C. § 1983 suffices to give the Defendant fair notice of her claim and the grounds upon which it rests. While the Defendant and the Court can make certain assumptions about Plaintiff's intentions, it is for Plaintiff to make such allegations, not for the opposing party to discern Plaintiff's meaning. For example, Plaintiff has not specifically stated the basis for her § 1983 claim. This is not an inconsequential lack of clarity, since at least one district court in Virginia has held that claims under 42 U.S.C. § 1983 "cannot serve as a means to enforce a statute, such as the Voting Rights Act that has its own comprehensive internal enforcement scheme." *Moseley v. Price*, 300 F.Supp.2d 389, 396 n. 11 (E.D.Va.2004); *Jafari v. City of Richmond*, No. 3:05CV823–HEH, 2006 WL 5444365, at *3–4, 2006 U.S. Dist. LEXIS 94853, at *11 (E.D.Va. May 12, 2006) (Voting Rights Act case citing *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Assoc.*, 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) for the proposition that existence of express remedies demonstrates not only that Congress intended to foreclose implied private actions

but also that it intended to supplant any remedy that otherwise would be available under § 1983), *aff'd, Jafari v. City of Richmond,* 211 Fed.Appx. 200 (4th Cir.2006); *see also Baumgardt v. Wausau Sch. Dist.,* 475 F.Supp.2d 800, 808 (W.D.Wisc.2007) (suggesting Title IX preemption of § 1983 action included equal protection and due process claims). Accordingly, to the extent that Plaintiff sought to allege a claim pursuant to 42 U.S.C. § 1983, even if Plaintiff had standing, such claim would be **DISMISSED** without prejudice.

### B. Motion to Reconsider

Plaintiff filed a "Motion to Re-instate Request Motion for Contempt of Court To Issue Show Cause Order" on April 22, 2008. (Docket No. 7.) The complete motion states as follows:

> Plaintiffs, respectfully file this, their Motion for Contempt show cause order and notify Court defendant was served pursuant [F.R.C.P.] the City of Norfolk, their Motion for Contempt to show cause why it should not be found in civil contempt of the Final Judgment entered by this Court on January 24, 1991 in **Collins v. City of Norfolk, Civil Action No. 83–526–N (1991), ("Final Judgment").** Attach Certificate of Service hereto; which replaces the earlier filing as if originally filed.

(Docket No. 7.) As reviewed in detail above, by Order of June 11, 2008, Judge Smith denied the motion, finding that "the city complied with *Collins II* seventeen years ago," and, hence, "[t]hat case is closed." (Order, June 11, 2008, Docket No. 21 at 2.) Judge Smith concluded that since the *Collins II* case is closed, "[n]o basis presently exists for holding the city in civil contempt." *Id.*

Plaintiff filed a motion to reconsider the denial of the contempt motion. (Mot. for Recons., Docket No. 27.) In the motion to reconsider filed on July 11, 2008, Plaintiff argues that the District Court's June 11, 2008 Order "conflicts with the decision of the United States Supreme Court's order to the Fourth Circuit Court of Appeals to remand the Collins case back to the *U.S. District Court mandating a permanent injunction issued on January 3, 1991 enjoining the city from conducting at-large elections for city council members and from implementation of a new plan until approved by this Court." Id.* at 1. Based upon the Court's construction of Plaintiff's motion, it appears Plaintiff further argues that a permanent injunction preventing *any* at-large elections remains in place as a result of the 1991 *Collins VIII* Orders, and that this Court therefore has jurisdiction to prohibit the City of Norfolk from conducting any further city-wide election for a mayor that sits on City Council.

In response to the motion for reconsideration, the City of Norfolk argues that Plaintiff is ignoring the precise language utilized by Judge Clarke in the January 3, 1991 and June 24, 1991 Orders (hereinafter "1991 *Collins VIII* Orders"). (Def.'s Resp. to Mot. for Recons., Docket No. 29.) The City of Norfolk notes that the injunction language in the January 3, 1991 Order refers only to the "present plan" that was before the Court, meaning the injunction only applied to the then-existing method of electing the entire City Council at-large. *Id.* Furthermore, the City of Norfolk states that the January 3, 1991 injunction applied only until the District Court approved a new plan-which it did with its June 24, 1991 "Final Judgment Order." *Id.* The City of Norfolk also argues that the "Final Judgment Order" did not use any language that could be construed to have the effect of retaining jurisdiction over the matter, and that such order closed the case. *Id.* Finally, the City of Norfolk contends that neither the January 3, 1991 Order nor the June 24, 1991 Order

met the criteria in Fed.R.Civ.P. 65 for a permanent injunction since the former order contained no indicia of permanency and the latter contained no injunctive language at all.

When this issue was argued on September 17, 2008, the Court asked counsel for the City of Norfolk (who also represented the City of Norfolk during the 1991 *Collins VIII* litigation) whether there had been any objection to entry of the 1991 "Final Judgment Order" in *Collins VIII*. He responded that there had been no objection.[17] On September 19, 2008, counsel for the City of Norfolk filed a "Motion for Leave to File Supplemental Memorandum in Support of Motion to Dismiss," and attached the proposed supplemental brief. (Def.'s Mot. for Leave, Docket No. 43.) Having asked questions about the 1991 *Collins VIII* Orders during the September 17, 2008 hearing and having therefore placed the parties on notice of its interest, and finding that supplemental briefing would aid the decisional process, by Order of October 7, 2008 the Court ordered the filing of the supplemental brief and permitted Plaintiff additional time to object or respond, if she desired. (Order, Oct. 7, 2008, Docket No. 48.) On October 8, 2008, *amicus curiae* NAACP sought leave to file a supplemental memorandum in response to the City of Norfolk's supplemental brief, which motion is **GRANTED** and the memorandum is ordered **FILED**. (*Amicus Curiae's* Mot. to File, Docket No. 47.)

1. standard on motion to reconsider

 The Federal Rules of Civil Procedure expressly provide a district court discretion to revise interlocutory orders prior to final judgment. Fed.R.Civ.P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims ... may be revised at any time before the entry of [final] judgment...."). In considering motions for reconsideration of such interlocutory orders, a district court is not required to apply "the strict standards applicable to motions for reconsideration of a final judgment" under Fed. R.Civ.P. 59(e) because a district court "retains the power to reconsider and modify its interlocutory judgments ... at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir.2003). The power to reconsider the interlocutory judgment "is committed to the discretion of the district court." *Id.*; *see APCC Servs., Inc. v. AT & T Corp.*, 281 F.Supp.2d 41, 44 (D.D.C.2003) (Rule 54(b) reconsideration may be granted "as justice requires"); *Moore v. Hartman*, 332 F.Supp.2d 252, 256 (D.D.C.2004) (it is clear that "courts have more flexibility in applying Rule 54(b)" than Rule 59(e) and Rule 60(b)).

When Judge Smith entered the June 11, 2008 Order denying the original contempt motion, *amicus curiae* NAACP had not yet appeared as *amicus curiae* in this case, and the *Collins* plaintiffs had not yet filed their motion for contempt in that separately filed matter. Therefore, since *amicus curiae* NAACP has now briefed the issue and participated at oral argument, and since a virtually identical motion for contempt is before the Court in the *Collins* matter, the Court will address the motion to reconsider in some detail.[18]

---

**17.** The statement of Defendant's counsel indicating that the *Collins* plaintiffs did not object to entry of the June 24, 1991 Final Judgment Order merely reflects the signature of all counsel (without objection) on that Final Judgment Order, as well as the statements in the June 24, 1991 hearing transcript in the *Collins* file where plaintiffs' counsel said plaintiffs had no objection to the election plan itself, only the implementation date.

**18.** The Court is mindful that the Plaintiff appears in this case without counsel, *pro se.*

### 2. *Collins VI & VIII*

Reconsideration of this issue requires a close examination of the language in the *Collins* orders. As noted above, in the 1989 *Collins VI* opinion, the Fourth Circuit directed that:

> [u]pon remand, the district court should enjoin at-large elections for city council. The district court should afford the city a reasonable, specified time to prepare a plan that will remedy the vote dilution arising out of the city's at-large electoral system. The city must then submit the plan for clearance under section 5 of the Voting Rights Act of 1965. 42 U.S.C. § 1973c. If the city fails to enact a legal plan, the court should prepare a single district plan for the conduct of future elections.

*Collins*, 883 F.2d at 1244 (*Collins VI*). The City of Norfolk sought review of *Collins VI* by the Supreme Court. After the Supreme Court denied the Petition for Certiorari, the matter returned to the District Court where an agreed order was entered on January 3, 1991 providing for: 1) adoption of a remedial election plan after an opportunity for public comment, 2) submission of such remedial election plan to the Department of Justice for pre-clearance under Section 5 of the Voting Rights Act, 3) submission of such remedial election plan to the District Court if the Department of Justice pre-cleared same, 4) the conduct of a hearing to consider objections to such plan and establishment of a timetable for implementation of the plan, or 5) holding a hearing to consider proposed court-ordered single-member district plans for the conduct of future city council elections if the Department of Justice objected to the City of Norfolk's remedial election plan. After reviewing each of these steps, the January 3, 1991 Order

then provided that "[d]efendants are hereby enjoined from conducting at-large elections for the city council under the present plan under which all seven city council members are elected on an at-large basis and from implementation of a new plan until approved by this Court." (Order at 3, Jan. 3, 1991, *Collins VIII*, Def.'s Memo. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.)

After the Department of Justice pre-cleared the remedial election plan, on June 11, 1991 the City of Norfolk submitted to the District Court a petition for approval of the plan and asking for a "final order of dismissal," with an indication that the plaintiffs had no objection to such plan. *See* 42 U.S.C. § 1973a(c). On June 24, 1991, the District Court held a hearing on the petition. During that hearing, counsel for the plaintiffs confirmed that plaintiffs had no objection to the plan itself, but indicated that his clients had hoped for an earlier implementation date. (Hr'g Tr. 3, June 24, 1991, *Collins VIII*.) After the District Court decided to have the plan implemented in May 1992 rather than November 1991, counsel for the plaintiffs indicated he was going to sign the "Final Judgment Order" even though he objected to the date for implementation. Plaintiffs' counsel then signed the order without noting any written objection. (Final J. Order, June 24, 1991, *Collins VIII*, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.) That order concludes with the language: "[a]nd it appearing that nothing further remains to be done in this cause, the Clerk shall enter this order upon the civil docket book as a Final Judgment Order and shall send a copy to each counsel of record." *Id.* at 2. The June 24, 1991 Order was never appealed, and no further

---

Therefore, the Court has tried to explain the issues plainly, thoroughly, and in more detail than otherwise so as to insure that Plaintiff understands the Opinion and Order.

action has taken place in the *Collins* case until now.

3. scope of the 1991 *Collins VIII* Orders

Plaintiff seeks to hold the Defendant in contempt, arguing that a permanent injunction prevents any change to the 5–2 plan without approval of the District Court. *Amicus curiae* NAACP suggests that the 1991 *Collins VIII* Orders have prospective binding effect on the City of Norfolk, and that before changing the 5–2 plan, the Defendant should have sought relief from the 1991 *Collins VIII* Orders under Rule 60(b)(5) on the grounds that "applying it prospectively is no longer equitable." Fed.R.Civ.P. 60(b)(5). Because each of these avenues (contempt motion or Rule 60(b)(5) motion) requires that the underlying order(s) have prospective effect, the Court must determine whether the 1991 *Collins VIII* Orders have any prospective effect that would restrict the City of Norfolk from implementing the 5–2–1 plan without Court authorization and that would provide an independent basis for subject matter jurisdiction by this Court. When considering the scope of a court's power to enforce its orders, the examination begins at one end of the continuum with the power to enforce that attaches to any order, and extends to the other end of the continuum with the power to enforce that attaches to a permanent injunction. Also falling on the continuum are orders such as consent decrees, judgments that retain jurisdiction to enforce settlements, and institutional reform [19] orders.

#### a. Plaintiff's burden

In determining the scope and effect of the 1991 *Collins VIII* Orders, the Court is mindful of the fact that:

Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, *see Willy v. Coastal Corp.*, 503 U.S. 131, 136–37, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), which is not to be expanded by judicial decree, *Amn. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951). It is to be presumed that a cause lies outside this limited jurisdiction, *Turner v. Bank of North–America*, 4 U.S. 8, 4 Dall. 8, 11, 1 L.Ed. 718 (1799), and the burden of establishing the contrary rests upon the party asserting jurisdiction, *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182–83, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Therefore, federal courts should carefully examine their own subject matter jurisdiction. *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338 (1934).

When it is asserted that an order has been violated and a court is asked to enforce the order by civil contempt pursuant to its ancillary jurisdiction, the petitioner bears the initial burden of proving that the alleged contemnor has violated an outstanding court order. *Kokkonen*, 511 U.S. at 377, 114 S.Ct. 1673; *Commodity Futures Trading Comm'n v. Wellington*, 950 F.2d 1525, 1529 (11th Cir.1992) ("A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contem-

---

**19.** "Institutional reform" generally refers to litigation used to force institutions such as schools, prisons, mental health facilities, public housing and other similar governmental institutions to comply with the Constitution or other governing law. In institutional reform cases, a trial court may have an ongoing role in monitoring and enforcing the change within the institution.

nor has violated an outstanding court order."). Because Plaintiff asserts that this Court has continuing jurisdiction via the 1991 *Collins VIII* Orders such that it can hold the City of Norfolk in contempt, Plaintiff carries the burden of proving that there is an outstanding court order justifying the exercise of this Court's subject matter jurisdiction.

### b. prospective effect

The outcome of Plaintiff's motion turns on the language of the 1991 *Collins VIII Orders.* Plaintiff and *amicus curiae* NAACP have argued that the direction of the Fourth Circuit to the District Court in *Collins VI,* combined with the District Court orders in *Collins VIII,* resulted in a permanent injunction that precludes the City of Norfolk from adopting any form of at-large election for City Council-including the city-wide election of a mayor that sits on City Council.[20] *Amicus curiae* NAACP has further argued that where such orders have prospective effect, the proper vehicle for seeking modification is a Rule 60(b)(5) motion, which permits a court to relieve a party of a final judgment, order, or proceeding where applying it prospectively is no longer equitable. *Amicus curiae* NAACP initially characterized the order(s)

as providing for a permanent injunction. They have also cited cases that characterize election modification orders as "institutional reform" orders that contemplate continuing court supervision. However, subsequent references have suggested that the order(s) might alternatively be characterized as a judgment that continues to be implemented. The City of Norfolk has even suggested the possibility that the "Final Judgment Order" could be characterized as a consent decree, though without prospective effect. Therefore, the Court will begin its consideration of this issue by analyzing whether a permanent injunction exists, and then move on to the alternative arguments that are made under the umbrella of Rule 60(b)(5).[21]

### i. no permanent injunction

Plaintiff and *amicus curiae* NAACP argue that, as a result of the *Collins VI* opinion from the Fourth Circuit and the District Court's two 1991 *Collins VIII* orders reviewed above, there was a permanent injunction in place from 1991 to the present time.[22] Plaintiff and *amicus curiae* NAACP first make an unpersuasive argument that on remand the Fourth Circuit envisioned the District Court imposing a permanent injunction prohibiting the

---

**20.** The question of whether a district court can order a change in the composition of an elected body in an effort to remedy a Section 2 violation was raised at the September 17, 2008 hearing, but is not presently before the Court. *See Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994).

**21.** In its Order of August 14, 2008, this Court indicated it would not consider arguments of the *amicus curiae* that were, in substance, different from those of the Plaintiff. However, because *amicus curiae* NAACP has filed a separate motion to hold the City of Norfolk in contempt in the *Collins* case, and the Court has sought to address arguments made in both cases here, the Rule 60(b) argument of *amicus curiae* NAACP is addressed here.

**22.** In response to the City of Norfolk's argument that it was only enjoined by the January 3, 1991 District Court Order from having an all at-large method of election until a remedial plan was adopted, *amicus curiae* NAACP says that the City of Norfolk "conveniently ignores the June 24, 1991 order in which the *Collins* court completed the process of enjoining at-large election to the Norfolk City Council by ordering the 5–2 plan in effect." (NAACP Mot. for Leave to File Mem. in Resp. Ex. 1 at 2, Docket No. 47.) *Amicus curiae* NAACP further posits that "[t]he adoption of the 5–2 plan may have concluded *Collins,* but it did not end the prohibition against the City having at-large elections for its City Council." *Id.* at 3.

City of Norfolk from conducting further at-large City Council elections.[23] This Court need not focus on that issue because it is the agreed and unappealed 1991 District Court Orders in *Collins VIII* that control the actions and expectations of the parties. The failure to appeal the *Collins VIII* "Final Judgment Order" and/or argue that it failed to reflect the mandate of the Fourth Circuit resulted in a waiver of any argument that the District Court failed to follow the mandate of the Court of Appeals. *See Hicks v. Gates Rubber Co.,* 928 F.2d 966, 970–71 (10th Cir.1991) (failure to allege discrepancy between appellate court mandate and district court order on remand waives allegation of discrepancy). Therefore, if the City of Norfolk is to be held in contempt, it must be on the basis of language in the District Court's 1991 *Collins VIII* Orders, not the Fourth Circuit's mandate.

For there to have been a permanent injunction in place, the language in such order would have to comply with Federal Rule of Civil Procedure 65, governing injunctions. Accordingly, the Court will examine the rule and apply it to these facts.

Rule 65(d) governed the issuance of injunctions at the time the District Court entered its 1991 *Collins VIII* Orders. The version of the rule in place in 1991, entitled "Form and Scope of Injunction or Restraining Order," provided that:

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; *shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained;* and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Fed.R.Civ.P. 65(d)(1991) (emphasis added). In this case, the portions of the 1991 *Collins VIII* Orders on which the Plaintiff relies offer no specificity regarding the alleged permanent injunction. If language in either the January 3, 1991 or June 24, 1991 Orders was to be a permanent injunction preventing the City of Norfolk from ever making changes to its method of electing its City Council or mayor, then, as another court has observed about similar language, "it does not remotely conform to the dictates of Rule 65(d)." *See Reich v. ABC/York–Estes Corp.,* 64 F.3d 316, 320 (7th Cir.1995). The *Reich* court noted that "the consequence of the failure of an injunction to comply with Rule 65(d) is also quite dramatic. The purpose of the rule is 'to provide a solid foundation for any subsequent proceeding to enforce the injunction, as by a motion to hold the defendant

---

**23.** The argument that the Fourth Circuit intended the District Court to issue a permanent injunction prohibiting all city-wide elections for City Council is undercut by the use of specific permanent injunction language in other opinions from the Fourth Circuit. *See e.g., Finlator v. Powers,* 902 F.2d 1158, 1163 (4th Cir.1990) (decision issued within one year of *Collins VI,* stating "we reverse the decision of the district court, and permanently enjoin the State's enforcement of the Exemption"); *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l. Corp.,* 148 F.3d 417, 424 (4th Cir.1998) (opinion by same author of *Collins VI* directing that "[t]he district court is directed to enjoin immediately and permanently"); *Ely v. Velde,* 497 F.2d 252, 257 (4th Cir.1974) (opinion by same author of *Collins VI* directing that "the district court should permanently enjoin construction of a penal facility"). Had the Fourth Circuit intended to direct the District Court to exercise ongoing management of Norfolk's City Council elections, it would have directed the District Court to issue a permanent injunction or made some similar statement indicating such direction.

in contempt.'" *Id.*; *see The Original Great Amn. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 275–76 (7th Cir.1992).

In the *Collins VIII* iteration of the *Collins* litigation, the only order that can be treated as an injunction is the January 3, 1991 Order stating that the City of Norfolk is "hereby enjoined from conducting at-large elections for the city council under the present plan under which all seven city council members are elected on an at-large basis and from implementation of a new plan until approved by this Court." (Order at 3, Jan. 3, 1991, *Collins VIII*, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.) This injunction is best characterized as a preliminary injunction.[24] However, this preliminary injunction was followed by a "Final Judgment Order" that does not specifically mention the preliminary injunction. The "Final Judgment Order" simply approves the 5–2 plan as a remedy for the Section 2 violation, directs that such remedy should be implemented at the May 5, 1992 City Council election, and states that "nothing further remains to be done in this cause." (Final J. Order at 2, June 24, 1991, *Collins VIII*, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.) Plaintiff is here challenging the decision of the City of Norfolk to change its method of electing its mayor by effectively adding an eighth seat to the City Council for the mayor and permitting the entire city to vote for such mayor in a city-wide election. But there is no specific language in the "Final Judgment Order" that clearly (or ambiguously) enjoins the City of Norfolk from modifying the 5–2 plan, or permitting a mayor elected city-wide to sit on City Council.[25] Without such clear language, Plaintiff cannot successfully argue that there is an existing order in place that is "specific in terms," and "describ[ing] in reasonable detail, ... the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). Nor can Plaintiff successfully contend that there is any language in the "Final Judgment Order" that gives notice to the City of Norfolk that it is precluded from making changes to its 5–2 plan and could be held in contempt for doing so.

Neither the January 3, 1991 nor June 24, 1991 Order, standing alone or together, constitutes a permanent injunction prohibiting the City of Norfolk from implementing the 5–2–1 plan. Neither order uses the words "permanent injunction" or "permanently enjoin." In fact, only the January 3, 1991 Order refers to an injunction, using the word "enjoined" without indicating whether it was preliminary or permanent. The later June 24, 1991 "Final Judgment Order" specifically **disclaims** any prospective effect, stating that "nothing further remains to be done" and di-

---

**24.** It might be argued that there is some lack of clarity as to whether the injunction language in the January 3, 1991 Order survived the June 24, 1991 "Final Judgment Order." The Court concludes that the language in the January 3, 1991 Order did not survive the June "Final Judgment Order." However, even if one assumes that the injunction language continued past June 24, 1991, it is clear that the January 3, 1991 Order only applied to "the present plan under which all seven city council members are elected on an at-large basis," not a modification such as the 5–2–1 plan.

**25.** It should not escape notice that the order is entitled "Final Judgment Order." Black's Law Dictionary defines "Final Judgment" as follows: "A court's last action that settles the rights of the parties and disposes of all issues in controversy, except for the award of costs (and, sometimes, attorney's fees) and enforcement of the judgment." *Black's Law Dictionary* 847 (7th ed. 1999). Despite having legislatively recognized authority to retain jurisdiction, the District Court 1991 *Collins VIII* Orders did not do so. 42 U.S.C. § 1973a(c).

rects that the Court's order shall be entered on the "civil docket book as a Final Judgment Order." (Final J. Order at 2, June 24, 1991, *Collins VIII*, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.) If these were supposed to be orders with prospective permanent injunctive effect, they are not "specific in terms" as required by Rule 65(d); they do not "describe in reasonable detail ... the act or acts sought to be restrained;" and they are insufficient to put someone on "actual notice" of any permanently prohibited conduct. *See* Fed.R.Civ.P. 65(d) (1991). Therefore, since there is no permanent injunction order in compliance with Rule 65(d), there is no permanent injunction prohibiting the City of Norfolk from implementing the 5–2–1 plan, and the City of Norfolk cannot be held in contempt for violating a permanent injunction that does not exist. *See Alberti v. Cruise*, 383 F.2d 268, 271–72 (4th Cir.1967) (finding no injunction existed and noting that the Rule 65(d) injunction language requirements "are mandatory and must be observed in every instance").[26]

### ii. no institutional reform prospective effect for election orders

■ Although the Court has determined that the 1991 *Collins VIII* Orders, either individually or jointly, do not constitute a permanent injunction, the question remains whether such orders have some other kind of prospective effect. Some of the clearest discussions of alleged prospective effect pursuant to existing orders come in the context of Rule 60(b)(5) cases. Rule 60(b)(5), entitled "Grounds for Relief from a Final Judgment, Order, or Proceeding," provides that a court may relieve a party from a final judgment, order, or proceeding for various reasons, including an argument that "applying it prospectively is no longer equitable." Fed.R.Civ.P. 60(b)(5).

■ To varying degrees, federal courts have prospective power over their judg-

---

26. Examination of whether a permanent injunction exists arguably also requires a review of Fed.R.Civ.P. 58. The version of that rule that governed entry of judgment at the time the District Court entered its 1991 *Collins VIII* Orders, provided, in relevant part, that:

> (2) upon a decision by the court granting other relief, or upon a special verdict or a general verdict accompanied by answer to interrogatories, the court shall promptly approve the form of the judgment, and the clerk shall thereupon enter it. *Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a).*

Fed.R.Civ.P. 58 (1991) (emphasis added). As noted above, the only order that can be treated as an injunction is the January 3, 1991 preliminary injunction order stating that the City of Norfolk is "hereby enjoined from conducting at-large elections for the city council under the present plan under which all seven city council members are elected on an at-large basis and from implementation of a new plan until approved by this Court." (Order at 3, January 3, 1991, *Collins VIII*, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.) However, this preliminary injunction was followed by a "Final Judgment Order" that does not specifically mention the preliminary injunction, and as noted above, does not meet the requirements for such an injunction. Plaintiff challenges the decision of the City of Norfolk to change its method of electing its mayor by adding an eighth seat to the City Council for the mayor and permitting the entire city to vote for such mayor in a citywide election. But there is no "separate document" setting forth a "judgment" enjoining the City of Norfolk from modifying its 5–2 plan after the May 1992 implementation or adding an eighth seat to City Council for a mayor elected by the entire city. Without such a separate document, Plaintiff cannot successfully contend that there is a permanent injunction "judgment" preventing the City of Norfolk from implementing its 5–2–1 plan, and upon which contempt may be sought. *See Reich*, 64 F.3d at 319 (failure to comply with Rule 58 requirement renders purported injunction a nullity).

ments where a permanent injunction is issued, where a consent decree imposing ongoing injunctive relief is issued,[27] and where the court retains jurisdiction to enforce a private settlement agreement. *Thompson v. United States Dept. of Hous. and Urban Dev.*, 404 F.3d 821, 826–27 (4th Cir.2005), *see Kokkonen*, 511 U.S. at 379, 114 S.Ct. 1673, *see also Roberson v. Giuliani*, 346 F.3d 75, 80–83 (2d Cir.2003). Such continuing power may also arise in the context of orders and decrees issued in institutional reform litigation, where the public interest is significantly implicated "because such decrees reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." *Thompson*, 404 F.3d at 826 (citing *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 380–81, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)). "A court's inherent authority to modify a consent decree or other injunction is now encompassed in Rule 60(b)(5) of the Federal Rules of Civil Procedure." *Id.* Therefore, an examination of cases arising under that rule, and answering the question of whether a final judgment or order applies "prospectively," addresses the alternative contentions made by *amicus curiae* NAACP.

Whether there is prospective effect for a court order finding an election plan constitutionally defective, and approving a new plan, was addressed by the United States Court of Appeals for the Fifth Circuit in *Jackson v. DeSoto Parish Sch. Bd.*, 585 F.2d 726, 730 n. 1 (5th Cir.1978). In that case, a class of African–American plaintiff's successfully challenged an apportionment scheme for local elections, and the district court "approved a new plan submitted by the defendants as 'constitutionally acceptable and equitable.'" *Id.* at 728. The district court "signed an order to [that] effect on April 7, 1972, requiring elections to be held pursuant to its plan, and did not reserve jurisdiction." *Id.* Elections were then held under the new plan in 1972, 1974 and 1975. Prior to the 1976 elections, the plaintiffs instituted suit asserting, among other things, that the "plan was constitutionally incorrect because it required multimember districts." *Id.* at 728–29. The district court granted relief without providing the defendant school board with an opportunity to respond. In reversing the district court, the Fifth Circuit noted that "[i]f the plaintiffs contend merely that the former decision is now legally incorrect because of intervening higher court decisions, they should articulate that claim and the School Board should have an opportunity to respond." *Id.* at 730. However, the court anticipated that plaintiffs would argue that the 1972 order contemplated continuing court su-

---

**27.** The difference between a contested injunction and consent decree was explained in *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996) as follows:

A consent decree is an injunction. A judgment issued by a court in the exercise of its equitable or admiralty jurisdiction is called a decree, and when a decree commands or prohibits conduct, it is called an injunction. Consent decrees differ from contested injunctions in that, instead of being won in contested litigation, they are issued by the court pursuant to an agreement of the parties. A consent decree is therefore "in some respects contractual in nature," but the eq-

uitable decree based on the agreement "is subject to the rules generally applicable to other judgments and decrees."

*Id.* (citation omitted). Therefore, since a consent decree is an injunction, its terms must meet the specificity requirement of an injunction before there can be a finding of contempt for violation of such consent decree. *Id.; see Smyth v. Rivero*, 282 F.3d 268, 280 (4th Cir. 2002) ("Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effects, its terms require more careful scrutiny").

pervision and added that, while the plaintiffs might have alternatively filed a Rule 60(b)(5) motion for relief from the prior judgment because of the change in governing law, "in reapportionment, unlike school desegregation and institutional reform cases, **the court's jurisdiction is not continuing, and the plan, once adopted and acted upon, does not require further judicial supervision.**" *Id.* at 730 n. 1. (emphasis added). By so stating, the court recognized that election modification orders are not "institutional reform" orders that have prospective effect justifying continued court supervision.

This issue arose in the voting rights context again, though more recently, in *King v. State Bd. of Elections,* 979 F.Supp. 582 (N.D.Ill.1996), *vacated and remanded on other grounds,* 519 U.S. 978, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996), *aff'd on remand,* 979 F.Supp. 619 (1997). The three-judge district court panel in that case was faced with an on-going election dispute. A prior three-judge district court panel had entered a reapportionment order in 1991 covering the Fourth Congressional District of Illinois. *Id.* at 586. Later, a new action was filed alleging that the reapportionment plan violated the Fourteenth Amendment. *Id.* The defendants then argued that the new suit should be considered as an attempt to modify or vacate the original reapportionment order, and that the new suit should be transferred to the original three-judge district court panel for consideration. *Id.* The new three-judge district court panel refused to transfer the new suit to the prior three-judge district court panel. *Id.* at 588. Among the reasons cited for such refusal was that the original three-judge district court panel "did not retain jurisdiction to hear and decide future constitutional challenges to its reapportionment order." *Id.* at 599. In addressing defendants' argument that precedent from certain prior injunction

cases suggests that the original three-judge district court retained jurisdiction, the court responded as follows:

> This authority is inapposite as the [original] court issued its reapportionment order pursuant to Section 2 of the Voting Rights Act. To that end, the [original] court ordered that the court-ordered redistricting plan "shall govern the nomination and election of members of the House of Representatives from the States of Illinois, effective with respect to the 1992 primary and continuing until Illinois congressional districts are reapportioned in accordance with law." *Hastert* [*v. State Bd. of Elections*], 777 F.Supp. [634,] 662 [ (1991) ]. The [original] court thus not only declined to retain jurisdiction to consider subsequent non-party challenges to its reapportionment order but, equally important, it conditionally limited the duration of its order. (footnote omitted) *See Jackson* [, 585 F.2d at 730 n. 1] ("we note that . . . in reapportionment, unlike school desegregation and institutional reform cases, the court's jurisdiction is not continuing, and the plan, once adopted and acted upon [*i.e.,* **an election is held**], does not require further judicial supervision").

*Id.* at 590 (emphasis added). The *King* court therefore recognized, like *Jackson,* that election modification orders are not "institutional reform" orders that, in and of themselves, have prospective effect justifying continued court supervision. By defining the "acted upon" language from the *Jackson* opinion as "an election is held," the *King* court further clarified that, absent language reserving jurisdiction, the reach of the judgment ends once the first election is held implementing the new plan. *See id.*

Like the *King* and *Jackson* cases, the *Collins VIII* "Final Judgment Order" entered by Judge Clarke in 1991 did not

specifically, or by implication, retain jurisdiction. Furthermore, unlike school desegregation cases, and institutional reform cases, the District Court's jurisdiction over the June 24, 1991 *Collins VIII* Order did not continue after the May 1992 election was held. Implementation of the 5–2 plan was complete, and it did not require further judicial supervision. *King*, 979 F.Supp. at 590 (once election plan is adopted and election is held, further judicial supervision not required). Simply stated, the June 24, 1991 "Final Judgment Order" was not an institutional reform order, and the order had no prospective effect following the May 1992 election.

### iii. May 1992 implementation was still required

■ As the *King* court recognized, the absence of post-implementation prospective effect did not relieve the City of Norfolk from its obligation to comply with the District Court's judgment and use the 5–2 plan at the May 1992 City Council election. Even without the 1991 *Collins VIII* Orders having permanent injunctive effect, or even institutional reform prospective effect, the City of Norfolk was still required to implement the specific 5–2 remedial election plan approved by the District Court in the June 24, 1991 "Final Judgment Order." Had the City of Norfolk refused to implement the plan in May 1992, it would have been a direct challenge

to the District Court's order and a subsequent remedy would clearly be within a federal court's continuing jurisdiction to vindicate its authority and "effectuate it decrees." *Kokkonen*, 511 U.S. at 380, 114 S.Ct. 1673. "That a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective application'" so as to supervise changing conduct or conditions. *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C.Cir.1988). Furthermore, had the City of Norfolk refused to implement the 5–2 plan in May 1992 pursuant to the order of the Court, it seems clear that, in addition to pursuing contempt, the *Collins* plaintiffs could have asked the District Court to vacate the "Final Judgment Order" and restore the case to its docket for further proceedings. *See Kokkonen*, 511 U.S. at 378, 114 S.Ct. 1673; *Fairfax Countywide Citizens Ass'n v. County of Fairfax*, 571 F.2d 1299, 1303 (4th Cir.1978).[28] However, since the City of Norfolk did implement the 5–2 plan in May 1992, nothing further was required by the "Final Judgment Order."

### iv. final judgment terminated interlocutory preliminary injunction

■ The issue has also come before courts in contexts other than voting rights. Prospective effect of an alleged consent

---

**28.** The Fourth Circuit has also shed light on its construction of Rule 60(b)(5)-though not in an election context. It has noted that a construction "which apparently is to the effect that a judgment has prospective effect [so as to support continuing court supervision] so long as the parties are bound by it, would read the word 'prospective' out of the rule." *Schwartz v. United States*, 976 F.2d 213, 218 (4th Cir.1992). If a judgment still binds parties because it has not been executed, but has no "prospective" effect within the meaning of Rule 60(b)(5), surely an order that has been long ago executed (May 1992) cannot have

prospective effect under Rule 60(b)(5). The directive in the June 24, 1991 Order was that the City of Norfolk implement the agreed-upon 5–2 plan at its May 1992 City Council election. "No contention is made that the few duties required by the order were not immediately carried out, or that there is anything left to do under that order." *Id.* "That a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective application' for the purposes of Rule 60(b)(5)." *Twelve John Does*, 841 F.2d at 1138.

decree[29] was the issue in *Taylor v. United States and Arizona*, 181 F.3d 1017 (9th Cir.1999) (en *banc* ), which has some parallels to the present case, including the question of the continuing effect of an interlocutory order like the January 3, 1991 preliminary injunction in *Collins VIII.* Taylor petitioned for writs of habeas corpus and damages under 42 U.S.C. § 1983, challenging Arizona's inmate behavior and discipline rules. *Id.* at 1018. During the first evidentiary hearing, the parties decided to cease the hearing and negotiate an agreement. *Id.* Later, the parties "lodged an agreement which the district court adopted" in a December 22, 1972 Memorandum and Order. *Id.* at 1019. The Memorandum and Order outlined procedural and substantive rules for the administration of prison discipline that had been agreed upon by the parties; required the parties to prepare and submit revised rules within 90 days; allowed Taylor to present exception; indicated the court would adjudicate any appropriate issues and "will declare the resultant rules as generally suitable for use and application until changed"; and "retained jurisdiction to review this procedure within six (6) months to determine that it is operating properly." *Id.* The parties then completed their negotiations and submitted their final draft of proposed rules. *Id.* Taylor then submitted objections to some of the proposed rules, and the court held a hearing on such objections. The Court issued a Memorandum and Order ruling on such objections, and noted that "it was neither the duty nor the prerogative of this Court to dictate rules and regulations for the

prison," though the court did have the responsibility to "insure that the disciplinary rules on their face and as applied provide minimal due process as required by the Constitution and that their provisions do not violate the constitutional prohibitions against cruel and unusual punishment." [30] *Id.* at 1020.

The parties in *Taylor* then filed a stipulation on October 19, 1973 reflecting agreed changes to the final draft of the proposed rules as well as the one ordered change, and judgment was entered in Taylor's favor on the same day. The judgment approved the rules that were attached as an exhibit to the judgment and directed the prison to "adjust immediately the respective inmate release dates in accordance with the settlement of two-for-one time restoration stipulated by the parties." *Id.* The judgment further provided that "all relief sought by plaintiff members of the class heretofore designated to which they are entitled is granted by this Judgment and that the class, collectively and individually, is entitled to no other relief under this action." *Id.* In 1979, pursuant to Rule 60(b), Arizona moved to modify the 1973 judgment to substitute new disciplinary rules, and the court approved the new rules. Arizona filed another motion pursuant to Rule 60(b)(5) in 1994, seeking "modification of the consent decree entered in this matter in 1972" in order to permit the prison to adopt a new disciplinary system. *Id.* While objections to such request were being considered, in 1996 Arizona moved to "terminate the consent decree entered

**29.** Black's Law Dictionary defines "consent decree" as follows: "A court decree that all parties agree to." *Black's Law Dictionary* 419 (7th ed. 1999).

**30.** The discussion here of *Taylor* is not meant to suggest that the *Collins* court was with or without the power to engage in ongoing man-

agement of Norfolk's City Council elections had it chosen to do so or had either of the parties asked it to do so. The reference to the *Taylor* court's statement of limitations on its power is only to give the full context for the discussion of a case that has many other similarities to *Collins.*

in this case on December 22, 1972, and modified by order filed February 24, 1994, pursuant to Fed.R.Civ.P. 60(b)." *Id.* The district court denied the request, and Arizona appealed.

The Court of Appeals first looked at the December 22, 1972 order and found that it was a "case management order (reflecting the parties' stipulation) about how to proceed to dispose of Count Three," not a consent decree. *Id.* at 1022. Nonetheless, the court then noted that "even if the December 22, 1972 order were a 'consent decree,' the judgment does not mention it" and does not specifically incorporate the prison rules. *Id.* The court concluded that "the judgment itself leaves no doubt that the December 22, 1972 'consent decree' was *not* part of the relief that was granted." *Id.* In concluding that Arizona's motion to terminate the "consent decree" was moot, the court said that "[t]here is no December 22, 1972 consent decree left to be terminated, for once judgment was entered, the December 22, 1972 interlocutory order (whatever its label) disappeared. It was automatically terminated by the judgment. This means that the district court had no live motion before it." *Id.* at 1022–23. Like the interlocutory order in *Taylor*, the January 3, 1991 *Collins VIII* interlocutory preliminary injunction served as a case management order. It was not a consent decree. It reflected the steps mandated by the Fourth Circuit, and like the interlocutory order in *Taylor*, it was automatically terminated by the "Final Judgment Order."

v. *Collins VIII* "Final Judgment Order" disclaimed prospective effect

The *Taylor* court went on to address a "what if question that also has particular import for the issues before this Court, namely, what if Arizona had moved to reopen the final October 19, 1973 judgment instead of the 1972 interlocutory order. The court observed as follows:

> Although reluctant to do so, we now turn to that question because the dissent has addressed a different one, and it cannot be correct that the [Prison Litigation Reform Act]'s "immediate termination" provision may constitutionally be applied to the *Taylor* judgment. The judgment itself leaves no doubt that it left nothing more for the district court to do. Its terms could not be clearer: "All relief sought by plaintiff members of the class heretofore designated to which they are entitled is granted by this Judgment and [ ] the class, collectively and individually, is entitled to no other relief under this action." Period. The court did not retain jurisdiction, as it could have done. Nor does the judgment require Arizona to report on compliance, request permission to make changes, or return to court for any purpose, as it also could have done. Unlike cases where a consent decree does put an injunctive scheme in place and the court retains jurisdiction to enforce it, here the judgment explicitly granted all the relief to which Taylor was entitled. That relief does not include continuing jurisdiction. Indeed, so far as the record disclosed, the rules were implemented and the credits were restored; the judgment, in short, was executed. The case is over.

*Id.* at 1023.

The *Taylor* court then went on to explain why it disagreed with the dissent's view that there was continuing supervisory jurisdiction over the settled judgment:

> We disagree with the dissent's view that the district court had "continuing supervisory jurisdiction" or that Arizona availed itself of the court's "continuing supervisory jurisdiction" on several occasions. *See* Dissent at 6563–64 & n. 7.

The court did not have continuing supervisory jurisdiction because the October 19, 1973 judgment did not state that it was retaining jurisdiction. *See Kokkonen* [, 511 U.S. at 381–82, 114 S.Ct. 1673.] Nor did Arizona invoke the court's continuing supervisory jurisdiction in November 1979 or January 1994, but instead filed a routine motion to alter or amend judgment under Rule 60(b). That Arizona chose to ask the court's blessing on revisions to the rules by moving pursuant to Rule 60(b) to modify the judgment, and was successful, is immaterial to the point that it was a final judgment because changing the rules did not require court approval.

*Id.* at n. 11.

Just as in *Taylor*, it cannot be said here that the District Court in *Collins VIII* had continuing supervisory jurisdiction because the June 24, 1991 Order did not state that it was retaining jurisdiction or that a permanent injunction was being issued. Furthermore, like the language in the *Taylor* judgment where the court said "the class, collectively and individually, is entitled to no further relief under this action", *id.* at 1023, the June 24, 1991 *Collins* Order disclaimed any prospective effect or continuing supervision, stating that "nothing further remains to be done in this case."[31] (Final J. Order at 2, June 24, 1991, *Collins VIII*, Def.'s Mem. in Supp. of Mot. to Dismiss Ex. B, Docket No. 13.)

vi. final judgment orders not typically used to retain jurisdiction

*Amicus curiae* NAACP suggested at oral argument that the "Final Judgment Order" entered by the District Court is the normal kind of order entered in Voting Rights Act cases, and that such orders are intended—in the context of Voting Rights Act cases—to preserve the authority of the District Court for ongoing enforcement. While the *Jackson* and *King* voting cases discussed above put this argument to rest, the Court will address some of the cases primarily relied upon by *amicus curiae* NAACP in support of their contention that orders like the 1991 *Collins VIII* Orders are the normal kind used in Voting Rights Act cases to preserve ongoing enforcement authority.

An examination of these cases reveals that the entry of **consent decrees** or **permanent injunctions** was the method of preserving ongoing enforcement authority, not final judgment orders or final judgment orders following (or in conjunction with) a preliminary injunction. For example, *amicus curiae* NAACP pointed the Court to *Harris v. City of Hopewell*, Civ. No. 82–0036–R (E.D.Va.1983). Examination of the pleadings in *Harris* reveals that the same counsel represented the plaintiffs in the *Collins* case and the *Harris* case, and Judge Clarke also presided over both cases. Unlike the "Final Judgment Order" entered in the *Collins* case, the parties signed a "Consent Judgment" in the *Harris* case, and Judge Clarke entered such judgment on January 5, 1983.[32] Moreover, the "Consent Judgment" includes specific language providing that the City of Hopewell is "permanently restrained and enjoined from conducting or

---

**31.** The "Final Judgment Order" is not a consent decree. Nor is it *a pretrial* agreement reached by the parties. It simply enforces one of the only two options given by the Fourth Circuit—a pre-cleared plan or court-imposed plan. Furthermore, there is no language in the "Final Judgment Order" that retains jurisdiction by the District Court. To the contrary, the language specifically disclaims any continuing supervision.

**32.** Black's Law Dictionary defines a "consent judgment" as follows: "A settlement that becomes a court judgment when the judge sanctions it." *Black's Law Dictionary* 846 (7th ed. 1999).

holding any further municipal elections for members of the City Council for the City of Hopewell under which all seven members of the City Council are elected on an at-large basis." (Consent J., Jan. 5, 1983, *Harris v. City of Hopewell*, Civ. No. 82–0036–R (E.D.Va.1983), Docket No. 15 at 1.) Unlike the language in the 1991 *Collins VIII* Orders, the language in the first half of the *Harris* quote is quite clear that an injunction was in place by virtue of a "Consent Judgment."

*Amicus curiae* NAACP also relies on *Nat'l Assoc. for the Advancement of Colored People, Inc. v. City of Thomasville*, 401 F.Supp.2d 489 (M.D.N.C.2005), which is particularly instructive. In that case, the NAACP and several voters claimed that the at-large staggered term method of electing the mayor and five city council members of the City of Thomasville diluted minority voting strength in violation of the Voting Rights Act, as well as the Fourteenth and Fifteenth Amendments to the United States Constitution. *Id.* at 491–92. On March 18, 1987, prior to a trial on the merits, the district court entered an agreed "Judgment" order presented by the parties. *Id.* at 492. That order was described by the district court as a "consent judgment." *Id.* The consent judgment found that the "then-current at-large election procedure violated Section 2 of the Voting Rights Act in that it had the effect of preventing black voters from having a fair opportunity to elect candidates of their choice." *Id.* "With the consent of the parties the court ordered that the City of Thomasville amend its charter to expand the council to eight members (mayor and

seven council members); to have two council members elected from the City at large every two years, and to have the five other members elected from wards by the voters of those wards only, for four-year staggered terms." *Id.*[33] The judgment order also contained the following language: "3. Following the adoption of the amendment, the election of the City Council and mayor in 1987, shall be conducted accordingly, and not otherwise. 4. This cause is retained for further Orders of the Court." (*J.*, March 18, 1987, *Nat'l Assoc. for the Advancement of Colored People, Inc. v. City of Thomasville*, Judgment, C–86–291–S (M.D.N.C. March 18, 1987).)

In 2003, the voters of the City of Thomasville approved a referendum proposition changing the length of the terms so that all seven council members would have a two-year term, and changing the method of election to an at-large election system in which all of the candidates would be voted on at the same time, in a non-partisan, plurality election, with no ward residency requirement. *Id.* The plaintiffs sought, and received, an injunction preventing implementation of the new plan. *Id.* at 493. The defendants then filed a Rule 60(b)(5) motion to terminate the 1987 judgment and to accept the new election method approved in the referendum. *Id.* In granting the motion, the court noted that the governing order was a **consent** judgment, not a final judgment. It was on this basis that the court found that the original order, a consent judgment, had "prospective effect" such that it was covered by Rule 60(b)(5).[34]

---

**33.** This order requiring a change in the number of council members was by agreement and prior to the Supreme Court's opinion in *Holder*, 512 U.S. 874, 114 S.Ct. 2581.

**34.** This Court recognizes that in *City of Thomasville*, 401 F.Supp.2d at 495–96, the court described the governing consent judgment as

an "institutional reform" consent decree under *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Strictly speaking, the order was not an "institutional reform" litigation consent decree since it did not purport to manage an institution. *See Cobell v. Norton*, 283

*Amicus curiae* NAACP asserts that, like the City of Thomasville, the City of Norfolk should be required to file a Rule 60(b) motion seeking modification of the 1991 *Collins VIII* Orders before modifying the 5–2 plan to the 5–2–1 plan.[35] However, that argument is fatally flawed because, as discussed above, it rests on the assumption that there is a permanent injunction or consent decree in place that prevents the City of Norfolk from adopting the 5–2–1 plan. As the Court has concluded above, the 1991 *Collins VIII* Orders do not contain a permanent injunction. Since a consent decree is an injunction, *Gates,* 98 F.3d at 468, if the orders contain no permanent injunction, by definition they cannot reflect a consent decree. Furthermore, the 1991 *Collins VIII* Orders cannot be consent decrees because they did not result from an agreement of the parties. They resulted from contested litigation and final adjudication of the case, and were entered pursuant to the mandate issued by the Fourth Circuit. The City of Norfolk did not "agree" to modify its election plan. It was forced to do so despite its efforts at trial and on appeal to retain its at-large method of electing its City Council. Finally, even if the 1991 *Collins VIII* Orders were the functional equivalent of a consent decree, the language of the orders makes clear that there was to be no prospective application after the May 1992 election.[36] *Pure Country, Inc. v. Sigma Chi Fraternity,* 312 F.3d 952, 958 (8th Cir.2002) ("When construing a consent decree, courts are guided by principles of contract interpretation and, where possible, will discern the parties' intent from the unambiguous terms of the written consent decree, read as a whole.").

vii. there is no prospective effect under any circumstance

▇▇▇▇▇ Rule 60(b)(5), entitled "Grounds for Relief from a Final Judgment, Order, or Proceeding," provides that a court may relieve a party from a final judgment, order, or proceeding for various reasons, including an argument that "applying it prospectively is no longer equitable." Fed.R.Civ.P. 60(b)(5). Therefore, as discussed above, "an order or judgment may be modified under this portion of Rule 60(b)(5) only to the extent that it has 'prospective application.'" *Twelve John Does,* 841 F.2d at 1138. While "[v]irtually every court order causes at least some reverberation into the future, and has, in that literal sense, some prospective effect," the mere fact "[t]hat a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective

F.Supp.2d 66, 86–108 (D.D.C.2003) (conducting in-depth review of structural injunctions and consent decrees in institutional reform litigation and describing contours of such litigation as primarily applicable to schools, prisons, mental health facilities, public housing, and similar governmental institutions); *see also Thompson v. United States Dept. of Hous. and Urban Dev.,* 220 F.3d 241, 246–47 (4th Cir.2000) (consent decree intended to eliminate racial segregation and discrimination in city public housing system was properly characterized as an institutional reform litigation consent decree). As noted in *Jackson,* 585 F.2d at 730 n. 1, and *King,* 979 F.Supp. at 590, a court's jurisdiction is not automatically continuing so as to support ongoing judicial

supervision in election cases, whereas jurisdiction can continue in institutional reform cases.

**35.** A continuation or renewal of a dismissed suit pursuant to Fed.R.Civ.P. 60(b) is different from an effort to enforce a settlement agreement, which requires its own basis for jurisdiction. *Kokkonen,* 511 U.S. at 379, 114 S.Ct. 1673.

**36.** Furthermore, even where a consent decree is present, it does not generally result in continuing jurisdiction in perpetuity. *Davis v. Sch. Dist.,* 95 F.Supp.2d 688, 695 (E.D.Mich. 2000).

application' for the purposes of Rule 60(b)(5)." *Id.* In order to determine whether a judgment has prospective application within the meaning of Rule 60(b)(5), one must examine "whether it is 'executory' or involves 'the supervision of changing conduct or conditions[.]'" *Id.* at 1139 (quoting *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 431, 15 L.Ed. 435 (1856); and *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932)). As this Court noted above, that an order requires some future compliance does not necessarily bring it within the purview of Rule 60(b)(5). *Twelve John Does,* 841 F.2d at 1138. A construction of Rule 60(b)(5) "to the effect that a judgment has prospective effect so long as the parties are bound by it, would read the word 'prospective' out of the rule." *Schwartz,* 976 F.2d at 218. Under such construction of the rule, "any final order or judgment on the merits could potentially be reopened under Rule 60(b), which is plainly inconsistent with the requirement of prospective application as it has been applied thus far." *Twelve John Does,* 841 F.2d at 1140.

Even when viewed in the light most favorable to plaintiff, the 1991 *Collins VIII* "Final Judgment Order" cannot be construed as executory or involving the supervision of changing conduct or conditions. *See id.* at 1139. While the *Collins VIII* "Final Judgment Order" required the City of Norfolk to implement the 5–2 plan "at the next regularly scheduled Norfolk City Council Election set for May 5, 1992," like the situation in *Twelve John Does,* it "did not compel [the City of Norfolk] to perform, or order [it] not to perform, any future act; it did not require the court to supervise any continuing interaction between [it] and the other parties to the case; rather, it definitively discharged [the City of Norfolk] from any further involvement in the case." *Id.* As the court said in *Twelve John Does,* "[i]ndeed, under the analysis of *Wheeling* and *Swift,* it is difficult to see how an unconditional dismissal could ever have prospective application within the meaning of Rule 60(b)(5)." *Id.* (citing *Gibbs v. Maxwell House,* 738 F.2d 1153, 1155–56 (11th Cir.1984), holding "[t]hat plaintiff remains bound by the dismissal is not a 'prospective effect' within the meaning of Rule 60(b)(5) any more than if plaintiff were continuing to feel the effect of a money judgment against him"). The "Final Judgment Order" reflected the Court's approval of the post-trial and post-appeal remedy resulting from the Fourth Circuit's mandate to the District Court, but unlike the consent decrees in *City of Hopewell* or *City of Thomasville,* the District Court did not retain continuing supervisory jurisdiction over the conduct of Norfolk's City Council elections. *See Smyth,* 282 F.3d at 278–84 (discussing requirements for consent decrees and enforcement thereof). The District Court clearly had the power to enforce its June 24, 1991 "Final Judgment Order" if the City of Norfolk had refused to implement the 5–2 plan in May 1992. *See* Fed.R.Civ.P. 70. However, once the plan was implemented at that election, there was no continuing supervision of the new election plan under the auspices of the *Collins VIII* "Final Judgment Order."

*Amicus curiae* NAACP rightly asserts that permanent injunctions and consent decrees are the normal kind of orders entered in Voting Rights Act cases to preserve the authority of courts to supervise future elections. However, both Plaintiff and *amicus curiae* NAACP wrongly conclude that the 1991 *Collins VIII* Orders, either individually or in conjunction, constituted a permanent injunction or a con-

**390**

sent decree.[37] Therefore, for all of the above reasons, Plaintiff's motion to reconsider is **DENIED**.

### III. Conclusion

For the reasons stated above, the Court grants Defendant's motion to dismiss Plaintiff's Fourteenth Amendment claim, Fifteenth Amendment claim, Voting Rights Act claim, and 42 U.S.C. § 1983 claim, and such claims are **DISMISSED** without prejudice. Plaintiff's motion to reconsider is **DENIED,** and *amicus curiae* NAACP's October 8, 2008 memorandum in response to the City of Norfolk's supplemental brief is ordered **FILED**. Should Plaintiff desire to file a Second Amended Complaint intended to cure her allegations regarding standing and the defects in these claims, it must be filed with the Clerk of this Court by February 6,2009.[38] Failure to file such an Amended Complaint that remedies the defects outlined above will result in a dismissal with prejudice as to those claims dismissed without prejudice above. This means that if Plaintiff does not file an Amended Complaint, or files one that fails to remedy the defects outlined above, she will not be able to proceed on any of her claims that remain defective, and the case will be closed.

**IT IS SO ORDERED.**

---

**37.** Because the Court finds that the 1991 *Collins VIII* Orders do not constitute a permanent injunction or consent decree, it is unnecessary to decide whether Plaintiff has "independent" or "piggyback" standing to challenge Defendant's actions within the context of the *Collins* litigation. *Dillard v. Chilton County Comm'n,* 495 F.3d 1324, 1336–40 (11th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 2961, 171 L.Ed.2d 886 (2008).

**38.** As a result of the Court's rulings here, it is unnecessary to address any laches argument that may be applicable to Plaintiff's effort to extend the reach of the *Collins VIII* orders.